## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| BARBARA CRAW, on behalf of herself and other | X |
| similarly situated individuals; and | X |
| JOAN SHURTLEFF, on behalf of herself and other | X |
| similarly situated individuals, | X |
| | X |
| Plaintiffs, | X   **CASE NO: 18-CV-12149-MPK** |
| | X |
| vs. | X |
| | X   JURY TRIAL |
| HOMETOWN AMERICA, LLC, a Delaware | X   DEMANDED |
| limited liability company; HOMETOWN | X |
| AMERICA MANAGEMENT, LLC, a Delaware | X |
| limited liability company; HOMETOWN | X |
| OAKHILL, LLC, a Delaware limited liability | X |
| company; HOMETOWN OAK POINT I, LLC, | X |
| a Delaware limited liability company; and | X |
| HOMETOWN OAK POINT II, LLC, a Delaware | X |
| limited liability company, | X |
| | X |
| Defendants. | X |
| | X |

_____

## FIRST AMENDED CLASS ACTION COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

1.      As one of the largest operators of manufactured housing communities in the Commonwealth, Defendant Hometown America, LLC ("Hometown") makes management decisions that impact approximately 2,000 Massachusetts families which pay rent so that the manufactured houses they own – commonly called mobile homes or trailers – may sit on land in each such community leased to them by Hometown or one of its affiliates.

2.      While families living in manufactured housing communities are residential tenants insofar as they pay rent so that they may live on someone else's land, these tenancies differ from those of traditional residential tenants because the owners of manufactured housing

1

communities generally do not lease any structures to their tenants but rather only lease the land under each tenant's manufactured home, also called a home site.

3.    Accordingly, under both the common law and the Commonwealth's comprehensive statutory regime which regulates manufactured housing communities (Manufactured Housing Act), community owners are not responsible for any maintenance obligations respecting a tenant's manufactured home itself.

4.    Rather, community owners are only obligated to maintain the leased land on which each tenant's home sits – including any structures built into the land – as well as any community infrastructure such as roadways or sidewalks that are necessary for the tenant to use the leased land as a residence.

5.    Manufactured housing tenancies further differ from traditional residential tenancies in that manufactured housing tenants are much less mobile than traditional tenants and generally must sell their home in order to relocate, since relocation of a manufactured home is often impracticable due to the design or age of the home, the prohibitive cost of relocating the home or the shortage of sites to which the home may be relocated.

6.    This economic reality confers tremendous leverage upon community owners such as Hometown in dealings with their resident-tenants.

7.    Unfortunately for the hundreds of residents in Hometown's Oakhill and Oak Point manufactured housing communities – located respectively in Attleboro, and Middleborough, Massachusetts – Hometown has abused this leverage in order to shirk the most basic obligation it owes to those who lease home sites in both communities – the obligation to maintain the land on which those residents' manufactured homes sit.

8. Specifically, for at least the last six years, Hometown has implemented an unlawful policy at Oakhill and Oak Point that shifts onto those communities' residents the substantial burden of maintaining, repairing and replacing the permanent improvements built into the land on those residents' leased home sites ("Policy"), in violation of the Manufactured Housing Act as well as decades of jurisprudence protecting the rights of residential tenants.

9. Through its enforcement of the Policy, Hometown has attempted to saddle its residents with the responsibility for such home-site infrastructure that Hometown, as both a manufactured housing community operator and landlord, is required by law to maintain, repair and replace.

10. This infrastructure includes the cement slab upon which many residents' homes sit, the paved walkways and driveways leading from each home to the street and the underground sprinkler systems which water the grass on rented home sites, among other permanent improvements built into the leased land of both communities.

11. At best, the Policy has resulted in a substantial inconvenience for Oakhill and Oak Point residents, many of whom have been forced to choose between either coping with the loss of important home-site infrastructure or paying out-of-pocket to maintain the same – such as cracking walkways, deteriorating driveways or aging underground sprinklers, among others.

12. At worst, the Policy has resulted in perilous conditions for Oakhill and Oak Point residents, many of whose leased home sites are routinely inundated with water because cement slabs or paved walkways and driveways have not been graded properly or because the land on which their homes sit has not otherwise been adequately maintained so as to repel water away from residents' homes.

13.     Regardless of the specific result, Hometown – in conjunction with the other four defendants which assist Hometown with implementing policy and managing operations at Oakhill and Oak Point – has collected millions of dollars in home-site rent from Oakhill and Oak Point residents that should have been spent on services related to the maintenance of home-site infrastructure, services which neither Hometown nor any other related entity has provided.

14.     Plaintiff Barbara Craw has lived with her disabled son in Oakhill for more than ten years – where the manufactured home she owns sits on land leased to her by the Hometown affiliates which own or operate Oakhill.

15.     Since Ms. Craw moved into Oakhill, her leased home site has routinely flooded after rainstorms because the structures built into the home site – such as the driveway and the cement walkways – have not been properly graded or otherwise maintained to repel water away from the home site but rather cause the water to accumulate there.

16.     Such flooding has consistently inundated Ms. Craw's yard, left her driveway in ankle-deep water and damaged both the paved walkways around her home as well as her front porch.

17.     Nevertheless, Hometown and its affiliates – pursuant to the Policy – have refused to undertake the necessary maintenance to prevent such damage as well as to ensure that Ms. Craw's entire home site is usable even after a rainstorm.

18.     Plaintiff Joan Shurtleff is a seventy-four-year-old widow who has lived at Oak Point for more than ten years – where the manufactured home she owns sits on land leased to her by the Hometown affiliates which own or operate Oak Point.

19.     For most – if not all – of Ms. Shurtleff's tenure at Oak Point, substantial amounts of water have accumulated on her leased home site after rainstorms because the structures built

into the home site – such as the foundation slab on which her home sits – have not been properly graded or otherwise maintained to repel water away from the home site but rather cause the water to accumulate there.

20.     Such water accumulation has consistently flooded the crawl space beneath Ms. Shurtleff's home and has resulted in substantial damage to her house.

21.     Nevertheless, Hometown and its affiliates – pursuant to the Policy – have refused to undertake the necessary maintenance to prevent this flooding or the resultant damage to Ms. Shurtleff's home.

22.     Only after receiving this lawsuit did Oak Point management fully inspect the cause of the water problem on Ms. Shurtleff's home site and agree to improve her home-site infrastructure so that water is repelled away from her home instead of being directed beneath it.

23.     However, Oak Point management has not agreed to repair the substantial damage that the ongoing water accumulation has caused to Ms. Shurtleff's home.

24.     By this action, Ms. Craw and Ms. Shurtleff – on behalf of themselves and other similarly-situated residents of Oakhill and Oak Point – seek an injunction ordering Defendants to implement policies and procedures maintaining, repairing and replacing as necessary all permanent elements of the home sites in those communities so that all home sites are safe and in good repair, as required by law.

25.     By this action, Ms. Craw and Ms. Shurtleff – on behalf of themselves and other similarly-situated current and former residents of Oakhill and Oak Point – seek damages from Defendants to compensate those residents for injuries they have suffered as a result of Defendants' improper refusal to maintain, repair or replace the permanent elements of the home sites in those communities.

## JURISDICTION & VENUE

26.     Defendants have invoked the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1332(d) and 1453, commonly known as the Class Action Fairness Act, as well as 28 U.S.C. § 1367.

27.     Venue before the Court is proper pursuant to 28 U.S.C. §§ 1391(b) and 1441(a), as this lawsuit was initially filed in the Plymouth County Superior Court, Massachusetts, a substantial part of the events or omissions giving rise to the Plaintiffs' claims has occurred within Massachusetts and the Defendants – through their business activities as described below – are properly subject to the jurisdiction of the Massachusetts courts.

## PARTIES

28.     Plaintiff Craw is a disabled, single-mother who has resided in Oakhill with her disabled minor son for more than ten years.

29.     Plaintiff Shurtleff is an elderly widow who has resided in Oak Point for more than ten years.

30.     Defendant Hometown America, LLC ("Hometown") is a Delaware limited liability company that – through its affiliates – indirectly owns, manages and sets policy at 24,000 home sites located at 60 manufactured housing communities throughout the country, six of which are located in the Commonwealth and which include Oakhill and Oak Point – located in Attleboro, and Middleborough, Massachusetts, respectively; Hometown claims its principal place of business to be in Illinois.

31.     Defendant Hometown Oakhill, LLC ("Hometown Oakhill"), also a Delaware limited liability company, is an affiliate of Hometown which owns the land on which Oakhill is

located and the sole business of which is to lease such land to the approximately 175 resident families of Oakhill; Hometown Oakhill claims its principal place of business to be in Illinois.

32.    Defendants Hometown Oak Point I, LLC and Hometown Oak Point II, LLC (collectively, "Hometown Oak Point"), also Delaware limited liability companies, are affiliates of Hometown which own the land on which Oak Point is located and the sole business of which is to lease such land to the approximately 975 resident families of Oak Point; the Hometown Oak Point entities claim their principal places of business to be in Illinois.

33.    Defendant Hometown America Management, LLC ("Hometown Management"), also a Delaware limited liability company, is an affiliate of Hometown that has represented itself to be the managing agent at or beneficial owner of Oakhill or Oak Point; Hometown Management claims its principal place of business to be in Illinois.

<u>FACTS</u>

I.    MASSACHUSETTS MANUFACTURED HOUSING ACT

34.    Manufactured housing communities offer prospective homebuyers with a unique opportunity to achieve affordable single-family homeownership, affordability which rests largely on the fact that the components of manufactured homes are fabricated en masse and the fact that the value of the land on which these homes sit is not included in the home's purchase price because each homebuyer leases that land – known as a home site – from the community owner.

35.    As manufactured housing is generally immobile, the value of a community resident's home is affected substantially by the terms of the resident's lease agreement and the corresponding decisions or policies of the community owner in managing the community – as those decisions both impact residents' quality of life as well give rise to additional costs associated with living in that community.

36.     Thus, absent government regulation, community owners wield disproportionate bargaining power over the residents of their communities, insofar as the conduct of owners – such as in setting rents or undertaking maintenance – not only impacts the residents' quality of life but potentially limits residents' ability to sell their homes and relocate.

37.     The Manufactured Housing Act, now codified at Mass. Gen. Laws ch. 140, §§ 32A, *et seq.* ("Act"), was first enacted by the Massachusetts General Court ("Legislature") in 1939 and has since evolved into a comprehensive statutory regime designed to address this power imbalance by establishing robust public rights for manufactured housing community residents, many of whom the Legislature has determined to be elderly persons or of low and moderate income – often lacking in resources and deserving of legal protection.

38.     In 1993, the Legislature specifically amended the Act to strengthen its protection of manufactured housing community residents by, among other things, authorizing the Office of the Attorney General to draft and enforce specific regulatory protections for such residents.

39.     In 1996, the Office of the Attorney General promulgated regulations interpreting the Act, which are codified at 940 Mass. Code Regs. 10.00, *et seq.*

40.     These regulations set forth the rights and obligations of both community residents and community owners in an attempt to balance the competing need of residents for a source of safe, dignified and affordable housing with the need of owners for a reasonable return on their investment in the community, rights which manufactured housing community residents may enforce privately through the Massachusetts Consumer Protection Act.

41.     Through these regulations, the Office of the Attorney General clarified maintenance obligations in a manufactured housing community and generally placed upon community owners the responsibility for maintaining all elements of the community located

beyond the four walls of each resident's home – elements ranging from the land of each resident's home site, to the utility connections running to each resident's home to the common infrastructure shared by all residents such as roads and sidewalks.

42.     While the Regulations permit community owners to enforce reasonable aesthetic rules concerning the outward appearance of residents' homes and leased home sites, the Regulations explicitly prohibit community owners from shifting onto residents the burden of maintaining the leased land or the structures built into the leased land.

43.     940 Mass. Code Regs. 10.04(5)(f) specifically provides:

> *An operator shall not require any resident to make permanent improvements to the manufactured home site, or the manufactured housing community or any of its facilities, nor assess any separate fee or charge for any such permanent improvements made by the operator…*

44.     Accordingly, if such maintenance is necessary to ensure the that a home site is safe and otherwise fit for residential use, the Office of the Attorney General has determined in its regularly published *Guide to Manufactured Housing Community Law* that:

> *It is your community owner/operator's responsibility to maintain, repair, and replace the cement slab under your home as well as any lamp posts on your homesite and repave driveways and sidewalks when necessary, as well as any other permanent elements of your lot or the community.*

> *The Att'y Gen.'s Guide to Manuf. Hous. Cmty. Law* at § II.D.1.f (Nov. 2017).

45.     In this way, any policy that shifts onto a community's residents the burden of maintaining, repairing and replacing the permanent improvements built into the land on those residents' leased home sites – such as Hometown's Policy described above – violates the Manufactured Housing Act as well as basic tenets of Massachusetts law respecting residential tenancies.

9

II.    HOMETOWN'S IMPLEMENTATION OF THE POLICY AT OAKHILL

46.    In January of 2006, Hometown Oakhill purchased the land on which the Oakhill manufactured housing community sits from the community's former owner for $6.99 million.

47.    At the time of Hometown Oakhill's purchase of the Oakhill community, Hometown Oakhill had existed for less than four months.

48.    At the time Hometown Oakhill completed the purchase of the Oakhill community, Hometown was the sole "Controlling Person" and "Guarantor" of Hometown Oakhill – pursuant to the mortgage securing the land on which Oakhill sits in the amount of the loan that financed Hometown Oakhill's purchase of that community.

49.    At or around the time of Hometown Oakhill's purchase of the Oakhill community, Hometown Oakhill entered into a management agreement obligating Hometown Management to operate Oakhill.

50.    Shortly after Hometown Oakhill's purchase of the Oakhill community, Ms. Craw purchased a manufactured home at Oakhill and was instructed to begin paying monthly rent to "Hometown America" so that her home could sit on and her family could occupy a leased home site ("Site No. 100").

51.    Ms. Craw decided to purchase a manufactured home at and lease Site No. 100 because the transaction provided her with an affordable method of becoming a first-time homeowner while she managed her career and raised her then-infant son.

52.    At or around the time Ms. Craw moved into her manufactured home located on Site No. 100, Oakhill Community Manager Tammy Feeney provided Ms. Craw with various documents to sign, which formalized the terms of Ms. Craw's tenancy at Oakhill and which Ms. Feeney countersigned on behalf of Hometown Oakhill and Hometown Management.

53.     During Ms. Craw's first year residing at Oakhill, Site No. 100 routinely flooded during and after rainstorms – water which regularly covered the driveway and cement walkways built into Site No. 100, which often inundated the side-yard of Site No. 100 and which sometimes even reached the crawl space under Ms. Craw's home.

54.     Ms. Craw, who was particularly concerned about how the regular dampness might create mold that would aggravate her infant son's asthma, promptly complained about the flood problem to Community Manager Feeney who suggested the water issues were the result of anomalous weather conditions.

55.     However, the flooding on Site No. 100 did not vary from year to year as Ms. Feeney had suggested, but remained consistent.

56.     Moreover, the flooding often created dangerous conditions on Site No. 100 as the flood waters routinely covered the driveway and front walkways on Site No. 100 – a condition which prevented Ms. Craw from parking her car in the driveway and required her to cross ankle-deep water so that she and her son could reach her home's front door.

57.     The first step of Ms. Craw's front porch, which was often submerged in water, even rotted out.

58.     And so, Ms. Craw continued to complain to Ms. Feeney about the conditions on Site No. 100, complaints which Ms. Feeney finally addressed in or around November of 2009 by causing a channel drain and catch basin to be installed on or near Site No. 100 – in an attempt to divert accumulated water away from Ms. Craw's home.

59.     Although these improvements reduced the flooding in Site No. 100's side-yard, they did not resolve the underlying problem with the home site and water continued to inundate

the driveway and cement walkways on Site No. 100 – such that the cement walkways on the Site began to crack and crumble.

60.     Frustrated by Oakhill's slow and ineffective response to the problem conditions on her leased home site, in or around May of 2010, Ms. Craw suggested to Ms. Feeney that Site No. 100's permanent elements – such as the cement around her home or the driveway – might need to be re-graded or otherwise improved in order to prevent the regular flooding.

61.     During this conversation, Ms. Craw also requested that Ms. Feeney arrange for the repair of damage to Site No. 100's cement walkways caused by the continual flooding.

62.     In response to Ms. Craw's suggestion, Ms. Feeney stated that Oakhill was not responsible for such improvements or repairs – an assertion which surprised Ms. Craw, who responded in turn by formally withholding her home-site rent until Oakhill resolved the ongoing dangerous conditions at Site No. 100.

63.     Shortly thereafter, Ms. Craw received a letter from the Law Offices of Russo & Scolnick – drafted by Attorney Mark R. Laverty – who wrote on behalf of Hometown.

64.     In this letter, Attorney Laverty attributed Ms. Craw's concerns to anomalous weather, asserted that Oakhill management had resolved her concerns, suggested that any remaining concerns were Ms. Craw's responsibility to remedy and threatened to evict Ms. Craw and her son if she did not pay rent.

65.     Terrified by Attorney Laverty's letter, Ms. Craw promptly paid her rent and tried to make do with the difficult situation.

66.     Yet, despite Attorney Laverty's assertions to the contrary, the flooding problem on Site No. 100 had not been resolved and water continued to inundate the home site's driveway and cement walkways just as before.

67.     While Ms. Craw continued to complain about the flooding on her home site to Ms. Feeney, Ms. Craw's fear of retaliation greatly tempered her complaints and Ms. Feeney's responses alternated between disclaiming responsibility and blaming anomalous weather conditions.

68.     In or around 2013, Ms. Craw received a cancer diagnosis, a condition which forced her to leave her job so that she could focus her energies on her health and which restricted her ability to complain to Oakhill management about the problematic conditions on Site No. 100.

69.     Nevertheless, in the intervening years, Ms. Craw has continued to raise concerns about the condition of Site No. 100 with the new Oakhill Community Manager – Josephine Santa Fe (formerly Pizzimenti) who replaced Ms. Feeney – as well as with Hometown Regional Manager Kyle Howieson, the former of whom has consistently responded to Ms. Craw's concerns with non-committal platitudes and the latter of whom usually fails to respond at all.

70.     Ironically, although Oakhill has remained steadfast in its refusal to provide critical infrastructure maintenance services to Ms. Craw's leased home site, her monthly rent payments have continued to increase, from $400 per month when she first moved into the community in 2006 to $610 per month at present – an increase of more than 50%.

71.     In August of 2018, in an effort to control her annual rent increases, Ms. Craw requested that Community Manager Santa Fe provide Ms. Craw with a copy of the community's standard five-year Lease Agreement.

72.     Upon review of the Lease Agreement, Ms. Craw was surprised to learn that Hometown's informal policy of evading responsibility for maintaining, repairing and replacing the permanent improvements on her leased home site was in fact a formal written policy.

73.     Specifically, Section 6 of the proposed Lease Agreement provides in relevant part:

> *6. HOMESITE AND HOMESITE MAINTENANCE*
> *The physical improvements provided for the exclusive use of RESIDENT are the homesite referenced above and utility connections located on the homesite.  Other improvements located on the homesite at the initiation of this Agreement such as concrete surfaces, if any, trees and other fixtures are to be maintained by RESIDENT during the period of RESIDENT's tenancy. ...*

III.    HOMETOWN'S IMPLEMENTATION OF THE POLICY AT OAK POINT

74.     In November of 2011, Hometown Oak Point purchased the land on which the Oak Point community sits from the community's former owners for more than $55 million.

75.     At the time Hometown Oak Point completed the purchase of the Oak Point community, the Hometown Oak Point entities had existed for less than one month.

76.     At the time of Hometown Oak Point's purchase of the Oak Point community, Hometown assumed liability for, and was listed as the "Key Principal" in, the mortgage securing the land on which Oak Point sits.

77.     Following Hometown Oak Point's purchase of the Oak Point community, Hometown Oak Point entered into an arrangement through which Hometown Management became the property manager of Oak Point.

78.     Accordingly, the standard Oak Point Home Site Agreement lists Hometown Oak Point as the lessors and Hometown Management as the "beneficial owner."

79.      By no later than 2012, Oak Point General Manager Fred Taylor and Oak Point Community Manager Peter Conant were aware of water drainage problems that were impacting home sites leased to various Oak Point residents and that were caused by improperly maintained permanent improvements to those home sites.

14

80.     Yet, in response to inquiries from Oak Point residents respecting water accumulation on their leased home sites, Mr. Conant routinely suggested that the reported standing water on each home site's cement slab or in each home site's yard was a normal occurrence that should not concern residents or otherwise acted as if the reported problems were not serious.

81.     If pushed by residents, General Manager Taylor or his interim successor – Oak Point Office Manager Debbera Silva – would agree to make minor repairs to address those residents' concerns – such as installing an extra drain on a home site.

82.     However, at no time did Oak Point management acknowledge that the ongoing water accumulation problems at Oak Point were community-wide problems and caused by permanent home-site improvements that were improperly graded or otherwise inadequately maintained to repel water from residents' homes.

83.     By 2015, the growing number of water accumulation complaints from Oak Point residents became so great that Oak Point management – specifically Oak Point's new General Manager Doreen Lang – began advising residents that the reported flooding as well as the property damage it caused, though serious and substantial, were the responsibility of the residents.

84.     Moreover, Oak Point management's explicit direction to residents that they assume responsibility for the maintenance of the infrastructure on their leased home sites extended well beyond issues related to flooding and included representations to residents that residents were also responsible for repairing basic wear-and-tear to home-site infrastructure, such as paved walkways, paved driveways or underground sprinkler systems.

85.    In or around November of 2017, Oak Point residents began to organize and through these efforts eventually submitted complaints about the worsening conditions at over one hundred home sites to the U.S. Department of Housing and Urban Development ("HUD"), which responded by opening an official inquiry into conditions at Oak Point.

86.    Moreover, numerous residents also began complaining about conditions at Oak Point to officials at the Town of Middleborough, which began raising residents' concerns at meetings of the Town Board of Selectmen.

87.     At one of these meetings, held on April 30, 2018, Mr. Conant – speaking on behalf of Hometown and under mounting pressure to reverse the Policy – told the Board of Selectmen that Hometown would take responsibility for fully remediating the water accumulation that was impacting Oak Point home sites.

88.    Nevertheless, following HUD's announcement that it had limited the scope of its inquiry to the approximately 11% of Oak Point's home sites that had been constructed after 2011, Hometown retracted Mr. Conant's statement and explained that Hometown was not responsible for the 89% of Oak Point's home-site infrastructure that fell outside of the scope of HUD's inquiry because such infrastructure had been installed by the entities from which Hometown had purchased the community in 2011.

89.    This assertion was reiterated publicly by Regional Manager Kyle Howieson while speaking on behalf of Hometown at a Board of Selectmen meeting on July 23, 2018.

90.    When asked at the July 23rd meeting how he could reconcile Hometown's refusal to maintain Oak Point home-site infrastructure, such as the cement slab (or pad), with the contrary requirements of the Massachusetts Manufactured Housing Act, Mr. Howieson

responded that he "read the statute" and "[i]t doesn't say that the owners are responsible for the pad."

91.     When asked at the July 23rd meeting how he could reconcile his interpretation of the Act with the contrary interpretation of the Office of the Attorney General in the Guide to Manufactured Housing Community Law, an Act which the Attorney General is charged by statute to implement, Mr. Howieson responded that "the guide to manufactured housing document … isn't the law" but rather is just "someone's interpretation of the law."

92.     Only after intervention by Hometown's litigation counsel, in a letter sent approximately three weeks after Mr. Howieson's July 23rd statements, did Hometown's Policy purportedly "evolve" such that it agreed to "abide by the Attorney General's interpretation of the applicable regulations governing manufactured home communities."

93.     However, into what exactly the Policy has evolved remains unclear.

94.     Moreover, Defendant Hometown Oak Point has not modified the language of the standard Home Site Agreement which purports to obligate Oak Point residents to maintain all aspects of their leased home sites:

> *11. Maintenance. Alterations. Inspection.*
>
> *The Home Owner covenants and agrees to maintain the Home Site, the Home and any appurtenances to the Home (such as garage, front stoop or deck) in first class condition. ...*

95.     Plaintiff Joan Shurtleff has rented an Oak Point home site, at 3105 Fox Run, for more than ten years.

96.     During that time, Ms. Shurtleff has lived in a manufactured home which she owns and which sits on her rented home site.

97.     For years, Ms. Shurtleff has complained to Oak Point management about the water that routinely accumulates under and around her home after rainstorms, problem conditions which Oak Point management has failed to remedy.

98.     Oak Point initially responded to Ms. Shurtleff's complaints by undertaking minor repairs in or around her home site and advising Ms. Shurtleff that the water accumulation issue had been resolved – when in fact it had not been.

99.     In more recent years, Oak Point management has denied the existence of problematic water accumulation on Ms. Shurtleff's home site and told Ms. Shurtleff that any maintenance required under her home is her responsibility.

100.    On or about September 27, 2018, after Hometown received this lawsuit, a representative of the engineering firm Allen & Major Associates, Inc. (Phil Cordeiro) – at Hometown's direction – inspected Ms. Shurtleff's home site for problems related to water accumulation and inadequate drainage.

101.    According to the report of the September 27th inspection authored by Mr. Cordeiro, Ms. Shurtleff's home site needs a sizeable trench drain and corresponding drywell, among other improvements, so that water is no longer directed to the crawl space under Ms. Shurtleff's home – as it has been for years.

102.    Prior to Mr. Cordeiro's inspection, Ms. Shurtleff hired someone to document by video the conditions under her home – conditions which included, among other problems, substantial rusting to the support beams holding up Ms. Shurtleff's house as well as colored substances which Ms. Shurtleff fears may be mold.

103.    Although Ms. Shurtleff has shared this video with Oak Point management, Oak Point has remained silent about who is responsible for repairing the substantial damage that the ongoing water accumulation has caused to Ms. Shurtleff's home.

104.    However, Oak Point management has communicated the position in writing, as recently as September 26, 2018, that similar repairs are the responsibility of Oak Point residents.

IV.    CLASS ALLEGATIONS

105.    After learning of the extent to which the Defendants had employed the Policy to violate not only her rights but the rights of numerous other Oakhill and Oak Point residents, Ms. Craw retained counsel and caused a thirty-day demand letter to be sent to all Defendants, pursuant to the Massachusetts Consumer Protection Act, on August 21, 2018.

106.    Through this letter, Ms. Craw – on behalf of herself and all similarly-situated current and former residents of Oakhill and Oak Point – demanded that Defendants: (A) immediately discontinue the Policy; (B) immediately maintain, repair or replace the home-site infrastructure in Oakhill and Oak Point so that all home sites therein are safe and in good repair; and (C) compensate Oakhill and Oak Point residents for the injuries they have suffered as a result of the Policy.

107.    On September 24, 2018, Defendants timely responded with an unreasonable settlement offer and Ms. Craw subsequently commenced the instant class action lawsuit.

A.    FED. R. CIV. P. 23

108.    Ms. Craw and Ms. Shurtleff bring their claims on behalf of themselves and a putative class of more than 1,000 current and former resident-households of the Oakhill and Oak Point manufactured housing communities that have lived in either community at any time since

September of 2012 ("Putative Class"), a group which is numerous and which would be impracticable to join individually to the instant action.

109.    Ms. Craw's and Ms. Shurtleff's claims present for judicial determination factual and legal questions that are common to all members of the Putative Class and which predominate over any questions affecting only individual members, namely:

(a)  determination of the scope and duration of the Policy;

(b)  determination of whether the Policy violated the Massachusetts Manufactured Housing Act and corresponding regulations;

(c)  determination of whether the leasehold contracts entered into between one or more Defendants and the Putative Class members all expressly or impliedly incorporated the Policy into such leasehold contracts;

(d)  determination of whether such express or implied provisions are void as a matter of public policy and should be or should have been reformed to incorporate the applicable requirements of the Manufactured Housing Act and corresponding regulations; and

(e)  determination of whether Defendants' implementation of the Policy breached the Putative Class members' leasehold contracts or otherwise injured the Putative Class members.

110.    Ms. Craw's and Ms. Shurtleff's claims are typical of the claims of Putative Class members, as such claims are all based on the same Policy which was implemented uniformly as to all members such that the members' claims are all rooted in identical legal as well as remedial theories.

111.    Ms. Craw's and Ms. Shurtleff's proposed class action is superior to other available methods for the fair and efficient adjudication of this controversy in that the relatively

modest losses suffered by individual Putative Class members would be economically infeasible to litigate on an individual basis and that such piecemeal litigation would risk inconsistent application of the critical protections of the Manufactured Housing Act at issue before the Court.

112.    Ms. Craw, Ms. Shurtleff and undersigned counsel have demonstrated that they can and will both fairly and adequately protect the interests of the Putative Class members in pursuing this action.

113.    Specifically, Ms. Craw has a demonstrated track-record of public service on the Attleboro School Committee, is committed to obtaining a just resolution of this dispute to the benefit of all Putative Class members and lacks any reason because of which she may fail to vigorously seek the same.

114.    Specifically, Ms. Shurtleff has been engaged for months in the public debate with respect to the ongoing problems at Oak Point, is committed to obtaining a just resolution of this dispute to the benefit of all Putative Class members and lacks any reason because of which she may fail to vigorously seek the same.

115.    Specifically, the undersigned counsel is the director of a civil legal aid organization, holds both consumer law as well as class action experience, is committed to obtaining a just resolution of this dispute to the benefit of all Putative Class members and lacks any reason because of which he may fail to prosecute vigorously their interests.

116.    Insofar as Ms. Craw and Ms. Shurtleff seek injunctive relief requiring Defendants to cease enforcement of the Policy and replace it with compliant business practices, their claims concern conduct by Defendants that apply generally to the Putative Class so that such injunctive relief is appropriate respecting the Putative Class as a whole.

B.      MASS. GEN. LAWS CH. 93A, § 9(2)

117.    Ms. Craw and Ms. Shurtleff bring their Consumer Protection Act claims on behalf of themselves and a putative class of more than 1,000 current and former resident-households of the Oakhill and Oak Point manufactured housing communities which have resided in either community at any time since September of 2012 ("Putative Class").

118.    Ms. Craw and Ms. Shurtleff are similarly situated to all members of the Putative Class insofar as Ms. Craw, Ms. Shurtleff and all such members have resided in a manufactured housing community at which one or more of the Defendants have consistently enforced the Policy and, in doing so, have deprived Ms. Craw, Ms. Shurtleff and the Putative Class members of critical home-site infrastructure maintenance, repair or replacement services that Defendants were required by law to provide.

119.    Ms. Craw and Ms. Shurtleff have suffered an injury similar to the injury suffered by all members of the Putative Class insofar as Ms. Craw, Ms. Shurtleff and all such class members have paid substantial sums of rent to one or more Defendants corresponding to critical home-site infrastructure maintenance, repair or replacement services that Defendants neither provided nor caused to be provided.

120.    Ms. Craw, Ms. Shurtleff and undersigned counsel have demonstrated that they can and will both fairly and adequately protect the interests of the Putative Class members in pursuing this action.

COUNT I
BY BARBARA CRAW AND JOAN SHURTLEFF
ON BEHALF OF THEMSELVES AND THE PUTATIVE CLASS
CONSUMER PROTECTION ACT – MASS. GEN. LAWS CH. 93A, § 9
MANUFACTURED HOUSING ACT – MASS. GEN. LAWS CH. 140, § 32L
AS TO ALL DEFENDANTS

121.    Paragraphs 1 through 120 are incorporated herein, as if fully restated below.

122.    Plaintiffs and each Putative Class member are a person, as that term is used in Mass. Gen. Laws ch. 93A, § 9(1).

123.    Defendants are each a person engaged in the conduct of a trade or commerce, as those terms are used in Mass. Gen. Laws ch. 93A, §§ 2(a) and 9(1) – specifically as either a manufactured housing community operator or licensee, as those terms are used in 940 Mass. Code Regs. 10.01.

124.    The Policy is an unreasonable, unfair or unconscionable rule as contemplated by Mass. Gen. Laws ch. 140, § 32L, as well as corresponding regulations, and Defendants' implementation of the Policy is an unfair or deceptive act or practice pursuant to Mass. Gen. Laws ch. 93A, § 2.

125.    Defendants knew or should have known that the Policy was an unreasonable, unfair or unconscionable rule pursuant to Mass. Gen. Laws ch. 140, § 32L, as well as corresponding regulations, and their implementation of such Policy has been willful.

126.    Defendants knew or should have known that their conduct was unlawful and their failure to offer a reasonable settlement offer was in bad faith.

127.    Defendants' implementation of the Policy has injured Plaintiffs and each member of the Putative Class.

128.    Defendants' ongoing implementation of the Policy will irreparably harm Plaintiffs and each member of the Putative Class by forcing them to endure unsafe conditions on their

home sites and requiring them to pursue repeated legal action to enforce their right, under the Manufactured Housing Act, to properly maintained home-site infrastructure.

129.    Equitable relief requiring Defendants to comply with their obligations under the Manufactured Housing Act simply requires Defendants to follow the law and will substantially benefit Plaintiffs and each member of the Putative Class.

COUNT II
BY BARBARA CRAW AND JOAN SHURTLEFF
ON BEHALF OF THEMSELVES AND THE PUTATIVE CLASS
CONSUMER PROTECTION ACT – MASS. GEN. LAWS CH. 93A, § 9
AS TO ALL DEFENDANTS

130.    Paragraphs 1 through 129 are incorporated herein, as if fully restated below.

131.    Plaintiffs and each Putative Class member are a person, as that term is used in Mass. Gen. Laws ch. 93A, § 9(1).

132.    Defendants are each a person engaged in the conduct of a trade or commerce, as those terms are used in Mass. Gen. Laws ch. 93A, §§ 2(a) and 9(1).

133.    Defendants' implementation of the Policy is an unfair or deceptive act or practice pursuant to Mass. Gen. Laws ch. 93A, § 2.

134.    Defendants knew or should have known that the Policy was an unfair or deceptive act or practice pursuant to Mass. Gen. Laws ch. 93A, § 2, as well as corresponding regulations, and their implementation of such Policy has been willful.

135.    Defendants knew or should have known that their conduct was unlawful and their failure to offer a reasonable settlement offer was in bad faith.

136.    Defendants' implementation of the Policy has injured Plaintiffs and each member of the Putative Class.

137.     Defendants' ongoing implementation of the Policy will irreparably harm Plaintiffs and each member of the Putative Class by forcing them to endure unsafe conditions on their home sites and requiring them to pursue repeated legal action to enforce their right to properly maintained home-site infrastructure.

138.     Equitable relief requiring Defendants to comply with their obligations as landlords simply requires Defendants to follow the law and will substantially benefit Plaintiffs and each member of the Putative Class.

COUNT III
BY BARBARA CRAW AND JOAN SHURTLEFF
ON BEHALF OF THEMSELVES AND THE PUTATIVE CLASS
BREACH OF CONTRACT
AS TO DEFENDANTS HOMETOWN OAKHILL AND HOMETOWN OAK POINT

139.     Paragraphs 1 through 138 are incorporated herein, as if fully restated below.

140.     Plaintiffs and each member of the Putative Class have entered into a valid and binding lease contract – either for a specific term or at-will – with Defendants Hometown Oakhill or Hometown Oak Point so that Plaintiffs and each member may occupy a home site at either Oakhill or Oak Point.

141.     Defendants Hometown Oakhill or Hometown Oak Point breached each such contract by implementing the Policy and withholding critical home-site infrastructure maintenance services required as a matter of law by those lease contracts.

142.     Plaintiffs and each member of the Putative Class complied sufficiently with their obligations under each such lease contract as a matter of law so as not to excuse the breaching conduct of Defendants Hometown Oakhill or Hometown Oak Point.

143.    The breaching conduct by Defendants Hometown Oakhill or Hometown Oak Point deprived Plaintiffs and each member of the Putative Class of their expectancy under the contracts and accordingly caused damage to Plaintiffs and each member of the Putative Class.

144.    The continued breaching conduct by Defendants Hometown Oakhill and Hometown Oak Point will irreparably harm Plaintiffs and each member of the Putative Class by forcing Plaintiffs and the Putative Class to endure unsafe conditions on their unique home sites – for which there is no adequate remedy at law.

145.    Equitable relief requiring Defendants Hometown Oakhill and Hometown Oak Point to comply with their obligations under the contracts simply requires the two defendants to follow the law and will substantially benefit Plaintiffs and each member of the Putative Class.

COUNT IV
BY BARBARA CRAW AND JOAN SHURTLEFF ON BEHALF OF THEMSELVES
QUIET ENJOYMENT STATUTE – MASS. GEN. LAWS CH. 186, § 14
AS TO DEFENDANTS HOMETOWN OAKHILL,
HOMETOWN OAK POINT AND HOMETOWN MANAGEMENT

146.    Paragraphs 1 through 145 are incorporated herein, as if fully restated below.

147.    Plaintiffs are each a tenant or lessee, as contemplated in Mass. Gen. Laws ch. 186, § 14.

148.    Defendants Hometown Oakhill, Hometown Oak Point and Hometown Management are each a landlord or lessor, as those terms are used in Mass. Gen. Laws ch. 186, § 14.

149.    Implementation of the Policy by Defendants Hometown Oakhill, Hometown Oak Point and Hometown Management substantially impaired the character and value of each Plaintiff's respective leasehold or home site.

150.    Defendants Hometown Oakhill, Hometown Oak Point and Hometown Management knew or should have known that the Policy would substantially impair the character and value of each Plaintiff's respective leasehold or home site.

151.    Implementation of the Policy by Defendants Hometown Oakhill, Hometown Oak Point and Hometown Management reduced the value of each Plaintiff's respective leasehold or otherwise caused each Plaintiff damage.

152.    Defendant Hometown Oakhill's, Hometown Oak Point's and Hometown Management's ongoing implementation of the Policy will irreparably harm Plaintiffs by forcing each to endure unsafe conditions on her leased home site and requiring each to pursue repeated legal action to enforce the right of each to properly maintained home-site infrastructure.

153.    Equitable relief requiring Defendants Hometown Oakhill, Hometown Oak Point and Hometown Management to comply with their obligations under the law simply requires these defendants to follow the law and will substantially benefit Plaintiffs and other residents of communities operated by these defendants.

<u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs request that the Court:

A.    Enter an order against all Defendants, jointly and severally, awarding to Plaintiffs and the members of the Putative Class the actual, incidental, consequential and multiple damages suffered by them or the maximum amount of statutory or nominal damages provided or permitted by law;

B.    Issue an injunction ordering Defendants to immediately perform all maintenance, repair and replacement work to home-site infrastructure located at Oakhill and Oak Point so that Oakhill and Oak Point home sites are all in good repair, as required by law;

C.      Issue an injunction ordering Defendants within sixty days to submit for the Court's approval written policies and procedures whereby Defendants will assume responsibility for the maintenance, repair and replacement of the home-site infrastructure located at Oakhill as well as Oak Point and, upon Court approval, issue an injunction ordering all Defendants to implement said policies and procedures;

D.      Enter an order against all Defendants, jointly and severally, awarding to Plaintiffs and the members of the Putative Class the litigation costs and reasonable attorney's fees associated with the prosecution of this action;

E.      Enter an order against all Defendants, jointly and severally, awarding to Plaintiffs and the members of the Putative Class pre- and post-judgment interest on all applicable amounts awarded by the Court;

F.      Enter any further order the Court deems necessary for the just and proper resolution of this matter.


Respectfully submitted,                              This 31st day of October, 2018
BARBARA CRAW & JOAN SHURTLEFF,
By their attorneys,

/s/ Ethan R. Horowitz
_____
Ethan R. Horowitz
BBO # 674669
Northeast Justice Center
50 Island Street, Suite 203B
Lawrence MA 01840
(978) 888-0624
ehorowitz@njc-ma.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2018, the foregoing Amended Complaint was electronically filed with the Clerk of the Court through the CM/ECF system, which will send notification of such filing to registered participants, including counsel for the Defendants.

/s/ Ethan Horowitz

Dated: October 31, 2018

_____

Ethan R. Horowitz
BBO # 674669