UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BARBARA CRAW, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil No. 18-12149-LTS |
| | ) |
| HOMETOWN AMERICA, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

ORDER ON MOTION TO DISMISS (DOC. NO. 29)

March 21, 2019

SOROKIN, J.

On September 25, 2018, plaintiffs Barbara Craw and Joan Shurtleff brought this action in Plymouth Superior Court on behalf of themselves and other similarly situated current and former residents of two manufactured housing communities. Doc. No. 1-1 at 7, 12. The defendants removed the case to this Court on October 15, 2018. Doc. No. 1. On October 31, 2018, the plaintiffs amended their complaint. Doc. No. 10. The Amended Complaint alleges that the defendants unlawfully refused to make necessary repairs to the infrastructure on the homesites of the plaintiffs and the other putative class members, resulting in damage to their homes and dangerous conditions on their homesites. Id. ¶¶ 7–12. On November 21, 2018, the defendants moved to dismiss the Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Doc. No. 29. The plaintiffs opposed. Doc. No. 44. The Court held a hearing on the motion on February 28, 2019. See Doc. No. 55. After the hearing, plaintiffs and defendants each submitted a supplemental brief at the Court's invitation. Doc. Nos. 57, 58. For the reasons set forth below, the Court DENIES the defendants' motion to dismiss in its entirety.

I.      BACKGROUND[1]

A.      Manufactured Housing in Massachusetts

Although manufactured housing is sometimes referred to as "mobile homes," the latter term is

> somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks . . . A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. . . . When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.

Yee v. City of Escondido, Cal., 503 U.S. 519, 523 (1992). As a result, the decisions of a manufactured housing community's owner can have a significant impact not only on residents' quality of life but also on the value of their homes and their ability to resell them. Doc. No. 10 ¶ 36.

The Massachusetts Manufactured Housing Act, the earliest version of which was adopted in 1939, 1939 Mass. Acts 416, was passed to recognize "that manufactured housing communities provide a viable, affordable housing option to many elderly persons and families of low and moderate income, who are often lacking in resources and deserving of legal protection," Greenfield Country Estates Tenants Ass'n, Inc. v. Deep, 666 N.E.2d 988, 990 (Mass. 1996). Its

---

[1] In evaluating this motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] as true all well-pleaded facts set forth in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011). It also "augment[s] these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). Where this section discusses government documents, the Court takes judicial notice of the contents of those documents under Fed. R. Evid. 201(b)(2).

goal was "to avoid discontinuances of manufactured housing communities and to ensure that tenants of such communities are not left at the peril of their landlords due to a practical inability to relocate a manufactured housing unit." Id. at 992. The Act, which has been amended several times since its passage, "establishes a statutory scheme intended to protect tenants of manufactured housing communities." Greenfield, 666 N.E.2d at 990; see also Mass. Gen. Laws ch. 140, §§ 32A–32S.

Among other things, the Act requires a community operator to obtain a license from the city or town where the community is located and to maintain the community free from unsanitary conditions. Mass. Gen. Laws ch. 140, §§ 32A, 32B, 32C. The prohibition on "unsanitary condition[s]" dates to the first version of the Act in 1939. See 1939 Mass. Acts 416. The Act also limits the ability of a community operator to evict a tenant, specifying the only permissible reasons for doing so. Mass. Gen. Laws ch. 140, § 32J. The Act requires a community operator to obtain approval from the Attorney General before imposing community rules, forbidding rules that are "unreasonable, unfair, or unconscionable." Id. § 32L.

With a similar goal of protecting state residents, at least as early as 1965, Massachusetts adopted a statute requiring the state's Department of Public Health to "adopt . . . public health regulations to be known as the state sanitary code, which . . . shall deal with matters affecting the health and well-being of the public in the commonwealth." 1965 Mass. Acts 898. Pursuant to the law, the Department of Public Health has adopted and periodically revised a State Sanitary Code, now codified at 105 Mass. Code Regs. 410. At least as early as 1969, the Sanitary Code has required owners of leased real property to "install and maintain . . . structural elements" of dwellings they own. Doc. No. 42-7 at 7. The 1969 Sanitary Code defined an owner as "every person who . . . has legal title to any dwelling or dwelling unit." Id. at 4. By 1977, the

Department of Public Health had expanded the definition of "owner" to include the owner of a "mobile dwelling unit or parcel of land . . . including a mobile home park." Doc. No. 42-8 at 6.

These portions of the Sanitary Code are substantially unchanged today. The current regulations provide that "[e]very owner shall maintain the . . . structural elements of his dwelling so that the dwelling . . . is rodent-proof, watertight and free from chronic dampness, weathertight, in good repair and in every way fit for the use intended." 105 Mass. Code Regs. 410.500. "Owner means every person who . . . has legal title to any dwelling, dwelling unit, mobile dwelling unit, or parcel of land, vacant or otherwise, including a mobile home park," or who "has care, charge or control of" the same "in any capacity," while "[d]welling means every building or shelter . . . used or intended for human habitation and every other structure or condition located within the same lot line whose existence causes or is likely to effect noncompliance with the provisions of" the Sanitary Code. Id. 410.020.

In 1974, Massachusetts Attorney General Robert H. Quinn adopted regulations under the Massachusetts Consumer Protection Act governing the relationship between landlords and tenants generally—i.e., not limited to manufactured housing communities—which remain substantially unchanged today. Massachusetts Department of the Attorney General, "Landlord-Tenant Relationship Regulations" (Sept. 6, 1974) (on file with the Attorney General's Office); see also 940 Mass. Code Regs. 3.17. The regulations, which remain unchanged in relevant part today, define unfair and deceptive landlord practices in areas such as maintenance, rental agreements, security deposits, and eviction. Id.

In 1983, Massachusetts Attorney General Francis Bellotti issued a document called the "Mobile Home Park Law Guide" that described, among other things, those regulations and their application to manufactured housing communities. Massachusetts Attorney General's Office,

Public Protection Bureau (1983), https://archive.org/details/attorneygeneralb00rodd (hereinafter "1983 Guide"). Although the Guide stated that its "purpose is to define the law as clearly as possible, so that both residents and park owners will become aware of their individual rights and their responsibilities to each other," it also clarified that it "is not the law," but rather "a guide to the law prepared by the Attorney General's Consumer Protection Division." Id. at 1–2.[2]

The Guide explained that the "Attorney General has promulgated regulations governing landlord-resident relationships," which "specifically pertain to [manufactured homes], the lots they occupy and the park grounds as well." Id. at 15. Citing state regulations and case law, the document further explained that

It is a violation of law for the park owner to . . .

a.) Rent premises (i.e., a [manufactured home], the lot it occupies, and/or the park grounds), which at the beginning of the residency are unfit for human habitation, or contain a defect which violates the law or poses a threat to the resident's health, safety, or well-being. 940 CMR 3.17(1)(a). This means that at the inception of the rental there are no latent, i. e. – undiscoverable but existing, defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain in a condition which makes the property liv[]able for the duration of the tenancy. [Bos. Hous. Auth. v. Hemingway, 293 N.E.2d 831, 843 (Mass. 1973).]

b.) Fail to maintain the premises in a condition fit for human habitation or fail to substantially remedy the conditions described in (a), above, after receiving written notice that these conditions exist. 940 CMR 3.17[(1)](b). . . .

f.) Fail to comply with the State Sanitary Code within a reasonable time after receiving notice of a Code violation from a resident or agency.

Id. at 15–16. The relevant provisions of the cited regulations remain the same in all material ways today. See 940 Code Mass. Regs. 3.01, 3.17. The 1983 Guide also explained that, while "[c]ertain provisions of the State Sanitary Code are directly applicable to [manufactured homes] and others are applicable by analogy . . . there are still some areas of uncertain application." 1983

---

[2] Subsequent revisions of the Guide contain a similar disclaimer.

Guide at 17. "The two major areas of concern explicitly covered by the Code are utility and sewage services and preservation of the park premises from generally unsanitary conditions." Id.

In 1993, Massachusetts amended the Manufactured Housing Act to authorize the state's Attorney General to "promulgate such rules and regulations as he deems necessary for the interpretation, implementation, administration and enforcement" of the Act. Mass. Gen. Laws ch. 140, § 32S; see also 1993 Mass. Acts 145.[3] In 1996, the Attorney General adopted regulations that remain the same in all material ways today. 798 Mass. Reg. 73 (Aug. 23, 1996); see also 940 Mass. Code Regs. 10.00.

Three regulations are of particular significance to the pending complaint. First, the regulations make violations of various other specified state statutes and regulations, including the Sanitary Code, a violation of Chapter 93A, provided that the violation concerns a manufactured home. Specifically, the regulations provide that "[a]ny violation of any applicable local, state or federal statute, regulation or ordinance governing landlord-tenant relations (including, but not limited to, M.G.L. c. 186, §§ 12 through 21, M.G.L. c. 111, § 127A, 105 CMR 410.000, local ordinances and rent control laws) with regard to manufactured housing shall constitute a violation of" the Consumer Protection Act, Mass. Gen. Laws ch. 93A. 940 Mass. Code Regs. 10.03(3). Next, the regulations also provide that a manufactured housing community's "operator shall not require any resident to make permanent improvements to the manufactured home site, or the manufactured housing community or any of its facilities, nor assess any separate fee or charge for any such permanent improvements made by the operator." Id. 10.04(5)(f). Finally, the regulations provide that a lease provision "which releases or limits the operator's liability arising

---

[3] Neither party points to a provision of the Manufactured Housing Act itself that controls this case. Rather, the arguments focus on the Attorney General's regulations.

under law or resulting from an act or omission of the operator" is "void and unenforceable." Id. 10.03(9)(b). The regulations also address community-homeowner lease provisions, certain required disclosures, and a minimum term of five years. See id. 10.03(4), (5).

In August 2000, Massachusetts Attorney General Tom Reilly issued a document called "The Attorney General's Guide to Manufactured Housing Community Law." Massachusetts Attorney General's Office (2000), https://archive.org/details/attorneygenera00mass; Doc. No. 42-9. The document explained that conditions in a manufactured housing community are governed by each community's rules, which "must comply with the standards established under the [Manufactured Housing] Act and the Regulations." Doc. No. 42-9 at 7. The document further explained that, in particular, it "is your community owner/operator's responsibility to repave driveways and sidewalks when necessary, as these are permanent elements of your lot or the community." Id. The events alleged in the Amended Complaint unfolded subject to the foregoing legal and regulatory framework governing manufactured homes in Massachusetts.

B.    Recent Events

Defendant Hometown America, LLC ("Hometown") indirectly owns and manages manufactured housing communities in several states, including in Massachusetts. Doc. No. 10 ¶ 30. Defendant Hometown Oakhill, LLC ("Hometown Oakhill"), an affiliate of Hometown, owns the land on which Oakhill, a manufactured housing community in Attleboro, is located. Id. ¶¶ 7, 30–31. Defendant Hometown America Management, LLC ("Hometown Management"), also Hometown's affiliate, "has represented itself to be the managing agent or beneficial owner of Oakhill." Id. ¶ 33. In January 2006, Hometown Oakhill, which at that point had existed for less than four months, bought the land on which Oakhill now sits from its former owner for

$6.99 million. Id. ¶¶ 46–47. Hometown Oakhill then entered into a management agreement with Hometown Management, obligating the latter to operate Oakhill. Id. ¶ 49.

Shortly thereafter, plaintiff Barbara Craw began to lease Site 100 at Oakhill and bought the manufactured home at that site. Id. ¶ 51. During Craw's first year at Oakhill, Site 100 routinely flooded during and after rain, regularly covering the driveway and cement walkways built into the site, often inundating the site's side yard, and sometimes reaching the crawlspace under Craw's home. Id. ¶ 53. The flooding created dangerous conditions on the site, routinely covering the driveways and walkways, requiring Craw and her infant son to cross ankle-deep water to reach their home, and rotting out the front step of Craw's porch. Id. ¶¶ 56–57. Craw promptly complained about the flooding to Tammy Feeney, Oakhill's community manager, who said the flooding resulted from "anomalous weather conditions." Id. ¶ 54. However, the flooding remained the same from year to year. Id. ¶ 55.

Meanwhile, the flooding at Craw's Oakhill homesite continued. In November 2009, in response to Craw's continued complaints about the flooding on Site 100, community manager Feeney caused a channel drain and catch basin to be installed on or near the site. Id. ¶ 58. Although the improvements reduced the flooding, water continued to inundate the driveway and cement walkways, which began to crack and crumble. Id. ¶ 59. As a result, in May 2010, Craw suggested to Feeney that the site's permanent elements, such as the cement around Craw's home or the driveway, needed to be re-graded or otherwise improved. Id. ¶ 60. She also requested that Feeney arrange for the cement walkways to be repaired. Id. ¶ 61. Feeney told Craw that Oakhill was not responsible for such improvements and repairs. Id. ¶ 62.

In response, Craw began withholding her home-site rent until Oakhill made the repairs she had requested. Id. Craw then received a letter from an attorney representing Hometown,

stating that her concerns had been caused by anomalous weather, that Oakhill management had resolved Craw's concerns, that Craw bore responsibility for remedying any remaining concerns, and that Craw would be evicted if she continued to withhold rent. Id. ¶ 64. Scared by the possibility of eviction, Craw resuming paying rent to Hometown even though the water problems at her site continued. Id. ¶¶ 65–66. Thereafter, Craw continued raising her concerns with Josephine Santa Fe, who replaced Feeney as Oakhill's community manager, and with Kyle Howieson, Hometown's regional manager. Id. ¶ 69.

In November 2011, Defendants Hometown Oak Point I, LLC and Hometown Oak Point II, LLC (collectively "Hometown Oak Point"), also affiliates of Hometown, bought the land on which Oak Point, a manufactured housing community in Middleborough, is located. Id. ¶¶ 7, 74–75. Hometown Oak Point, which at that point had existed for less than one month, bought Oak Point from its former owners for more than $55 million. Id. ¶¶ 74–75. Hometown Oak Point then entered into a management agreement with Hometown Management, obligating the latter to operate Oak Point. Id. ¶ 77. Hometown Management "has represented itself to be the managing agent or beneficial owner of . . . Oak Point." Id. ¶ 33.

At the time of Hometown Oak Point's purchase of Oak Point, plaintiff Joan Shurtleff already lived at 3105 Fox Run in Oak Point, which she had begun renting no later than 2008. Id. ¶¶ 30, 95–96. For years, Shurtleff has complained to Oak Point management about water that routinely accumulates around her home after rain, but management has not remedied the problem. Id. ¶ 97. Although management initially made minor repairs, it eventually began telling Shurtleff that repairs were her responsibility. Id. ¶¶ 98–99.

No later than 2012, Fred Taylor, Oak Point's then–general manager, and Peter Conant, its community manager, were aware of the water drainage problems at various Oak Point residents'

homesites caused by improperly maintained permanent improvements at those sites. Id. ¶ 79. At residents' request, Taylor or Oak Point's office manager Debbera Silva would agree to make minor repairs to homesites, such as the installation of an extra drain, to ameliorate these concerns. Id. ¶ 81. However, by 2015, Oak Point management, including its general manager Doreen Lang, began telling residents that the flooding and necessary repairs were residents' responsibility. Id. ¶ 83. Management also told residents they were responsible for other homesite infrastructure such as walkways, driveways, and underground sprinkler systems. Id. ¶ 84.

In November 2017, Massachusetts Attorney General Maura Healey issued a revised version of "The Attorney General's Guide to Manufactured Housing Community Law."[4] Although the underlying law had not changed, the revised version of the guide included a somewhat different statement about community owners' maintenance responsibilities than those in the earlier Guides. It states that it "is your community owner/operator's responsibility to maintain, repair, and replace the cement slab under your home as well as any lamp posts on your homesite and repave driveways and sidewalks when necessary, as well as any other permanent elements of your lot or the community." Id. at 14.

In August 2018, after a series of rent increases, Craw asked to review the five-year lease agreement that Oakhill, at that point, offered to new tenants. Id. ¶ 71. The template lease agreement provided that "improvements located on the homesite at the initiation of this Agreement such as concrete surfaces, if any, trees and other fixtures are to be maintained by RESIDENT during the period of RESIDENT's tenancy." Id. ¶ 73.

---

[4] Massachusetts Attorney General's Office (2017), available at https://www.mass.gov/files/documents/2017/11/13/MHC Guidebook (Nov 2017).pdf.

On April 30, 2018, after the U.S. Department of Housing and Urban Development ("HUD") opened an inquiry into conditions at Oak Point because of residents' complaints, Conant told a meeting of the Town of Middleborough's Board of Selectmen that Hometown would take responsibility for remediating the water accumulation problem at Oak Point homesites. Id. ¶¶ 85–87. However, after HUD announced that its inquiry was limited to the approximately 11 percent of Oak Point homesites installed after 2011, Hometown retracted Conant's statement, claiming that it was not responsible for infrastructure at the other 89 percent of homesites because it was installed before Hometown owned Oak Point. Id. ¶ 88. Howieson repeated that denial of responsibility at a July 23, 2018, meeting of the Board of Selectmen, specifically claiming that the Manufactured Housing Act does not assign responsibility for maintenance of a homesite's pad to a community's owner. Id. ¶ 89. He further stated that the Attorney General's Guide to Manufactured Housing Community Law "isn't the law" but rather is just "someone's interpretation of the law." Id. ¶ 91. Although Hometown has since claimed that it will "abide by the Attorney General's interpretation" of the law, Oak Point's standard homesite agreement still contains language that purports to require residents to maintain all aspects of their leased homesites. Id. ¶¶ 92, 94.

C.    Legal Action

On August 21, 2018, after retaining counsel, Craw sent the defendants a thirty-day demand letter under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, on behalf of similarly situated residents of Oakhill and Oak Point. Id. ¶¶ 105–06. The letter demanded that defendants maintain, repair, or replace the affected homesite infrastructure and compensate residents for damages caused by the lack of maintenance. Id. ¶ 106. On September

24, 2018, the defendants timely responded with what plaintiffs describe as an inadequate settlement offer. Id. ¶ 107.

As a result, Craw and Shurtleff brought this class-action lawsuit on behalf of a putative class of more than 1,000 current and former residents of Oakhill and Oak Point who have lived in either community at any point since September 2012. Id. ¶ 108. The plaintiffs' Amended Complaint alleges that Hometown "has implemented an unlawful policy at Oakhill and Oak Point that shifts onto those communities' residents the substantial burden of maintaining, repairing and replacing the permanent improvements built into the land on those residents' leased home sites." Id. ¶ 8. The suit seeks damages[5] for the plaintiffs and the putative class members, legal costs and fees, and injunctions requiring the defendants to make necessary repairs at the two communities and establish Court-approved policies and procedures for homesite maintenance. Id. at 27–28.

On September 27, 2018, Hometown hired Allen & Major Associates, Inc. to inspect Shurtleff's homesite for problems related to water accumulation and inadequate drainage. Id. ¶ 100. The report found that Shurtleff's homesite required a sizeable trench drain and drywell to prevent water from entering the crawl space beneath Shurtleff's home. Id. ¶ 101.

II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In

---

[5] As relief, the plaintiffs seek improvements to infrastructure that the plaintiffs assert defendants own, such as (but not limited to) concrete pads, and money damages for economic losses, including damage to property owned by the plaintiffs, such as their manufactured homes. Doc. No. 10 at 27–28.

evaluating a complaint, the court must accept all factual allegations in the complaint as true and construe all reasonable inferences in the plaintiff's favor. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions and "threadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678. A reviewing court must conduct a "context-specific" assessment of the pleadings by drawing on "its judicial experience and common sense." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (quoting Iqbal, 556 U.S. at 663–64). A complaint must be dismissed for failure to state a claim when it lacks "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997).

III.    DISCUSSION

Plaintiffs allege that the defendants have followed a policy ("the Policy") of shifting onto residents the burden of maintaining homesite infrastructure, including the concrete slab on which the manufactured homes sit and other permanent improvements to the land, such as concrete driveways, sidewalks, lampposts, and underground sprinklers.[6] Doc. No. 10 ¶¶ 8–10. The Amended Complaint sets forth sufficient factual allegations to allege plausibly the existence of the Policy. Defendants seek dismissal of each of the plaintiffs' claims, primarily (but not exclusively) on the contention that Massachusetts law imposes neither a duty on them, or any one of them, to perform the maintenance Plaintiffs seek, nor responsibility for the damages plaintiffs claim result from the alleged failure to perform the maintenance.

---

[6] At the hearing, counsel for the defendants explained that, as a matter of fact outside the scope of the present Rule 12 record, manufactured homes often do not sit on slabs, but rather on concrete blocks or various other objects. At this stage of the proceeding, the Court must accept as true the factual allegations of the Amended Complaint.

Plaintiffs' suit advances four causes of action against the defendants. First, Count I alleges that the defendants' Policy is "an unreasonable, unfair or unconscionable rule as contemplated by Mass. Gen. Laws ch. 140, § 32L [the Manufactured Housing Act], as well as corresponding regulations, and Defendants' implementation of the Policy is an unfair or deceptive act or practice pursuant to Mass. Gen. Laws ch. 93A, § 2." Doc. No. 10 ¶ 124. Count II alleges simply that "Defendants' implementation of the Policy is an unfair or deceptive act or practice pursuant to Mass. Gen. Laws ch. 93A, § 2," without reference to the Manufactured Housing Act.

Count III alleges that that defendants Hometown Oakhill and Hometown Oak Point breached their lease contracts with plaintiffs by "withholding critical home-site infrastructure maintenance services required as a matter of law by those lease contracts" through their alleged Policy. Id. ¶ 141. This theory rests not on an alleged violation of an express provision of a lease agreement, but rather on the alleged violation of the implied warranty of habitability. Finally, Count IV alleges that defendants Hometown Oakhill, Hometown Oak Point, and Hometown Management violated the Quiet Enjoyment Statute, Mass. Gen. Laws ch. 186, § 14, by "substantially impair[ing] the character and value of each Plaintiff's respective leasehold or home site." Id. ¶ 149.

The defendants have invoked this Court's diversity jurisdiction over these state law claims pursuant to the Class Action Fairness Act. See 28 U.S.C. §§ 1332(d), 1453(b). When a federal court exercises "diversity jurisdiction, state law supplies the substantive rules of decision." In re PHC, Inc. S'holder Litig., 894 F.3d 419, 427 (1st Cir. 2018). Several aspects of this matter therefore require the interpretation and application of Massachusetts law. "In such matters, we are bound by the teachings of the state's highest court." N. Am. Specialty Ins. Co. v.

Lapalme, 258 F.3d 35, 38 (1st Cir. 2001). Under Massachusetts law, "[a] fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." Sullivan v. Town of Brookline, 758 N.E.2d 110, 115 (Mass. 2001). "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated. Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." Harvard Crimson, Inc. v. President and Fellows of Harvard Coll., 840 N.E.2d 518, 521–22 (Mass. 2006). The Court applies these principles in its interpretation of the Massachusetts statutes and regulations on which the outcome of this motion depends.

    A.    Count I

        1.    Hometown's Duty to Maintain Homesites

Count I alleges that the defendants' implementation of the Policy violated the Manufactured Housing Act and its corresponding regulations, thereby also violating Chapter 93A. Defendants contend they violated no duties imposed by the foregoing laws, arguing that Massachusetts law does not impose "an affirmative obligation upon Hometown to maintain, repair, or replace Plaintiffs' home-site infrastructure." Doc. No. 30 at 16. Plaintiffs respond that the defendants' argument ignores "decades of Massachusetts authority" to the contrary. Doc. No. 44 at 6. Neither plaintiffs nor defendants cite case law directly on point, and both conceded at the hearing on this motion that they are unaware of any such case.

In light of the Policy and the facts plausibly alleged in the Amended Complaint, Count I advances two theories. First, it alleges that the Manufactured Housing Act and its regulations, standing on their own, impose a duty to maintain and make necessary improvements to homesites within manufactured housing communities. Both sides point to the Attorney General's regulation, 940 Mass. Code Regs. 10.04(5)(f), which prohibits community owners such as defendants from requiring a resident, such as either Plaintiff, to "make permanent improvements to the manufactured home site."

Several reasons persuade the Court that the Manufactured Housing Act and this regulation impose a duty upon defendants to make necessary homesite improvements.[7] First, the regulation unequivocally prohibits imposition of the duty upon residents. That language is clear, plain, and unequivocal, and therefore "should be given effect consistent with its plain meaning." Sullivan, 758 N.E.2d at 115. It is also a change in governing law that limits private parties' freedom to structure their relationship by contract. In general, commercial landlords, unlike residential landlords, have no duty to maintain except as required by contract. See Humphrey v. Byron, 850 N.E.2d 1044, 1049 (Mass. 2006). The regulation here, however, does not permit such a reordering. This strongly supports Plaintiffs' position that the regulation impliedly but affirmatively imposes the duty on defendants or at least leaves intact the common-law duty of residential landlords. See Bos. Hous. Auth. v. Hemingway, 293 N.E.2d 831, 842–43 (Mass. 1973) (describing residential landlords' duty).

Because the text of the regulation is not express on this point, the Court addresses additional considerations. Plaintiffs' second theory relies on the proposition that the Attorney

---

[7] Given that defendants did not raise the question, the Court does not explore the extent to which the duty applies to all or only some of the entities named as defendants.

General's regulation was not issued on a blank slate. Rather, community owners' responsibility for homesite infrastructure is consistent with both the clear text and the stated purpose of the Sanitary Code, which predated the regulations by nearly twenty years and is incorporated by reference into the regulations.[8]

The State Sanitary Code requires "[e]very owner" to "maintain the . . . structural elements of his dwelling so that the dwelling . . . is . . . watertight and free from chronic dampness, weathertight, in good repair and in every way fit for the use intended." 105 Mass. Code Regs. 410.500. "Owner" is defined to include "every person who . . . has legal title to any dwelling, dwelling unit, mobile dwelling unit, or parcel of land, vacant or otherwise, including a mobile home park," or who "has care, charge or control of" the same "in any capacity." Id. 410.020. Although the defendants in this case do not own the plaintiffs' homes, they hold legal title to and have control of the two manufactured housing communities at issue. By the plain terms of the Code, as owners of "mobile home parks", they therefore fall within the definition of "owner." The Code then defines "dwelling" as "every building or shelter . . . used or intended for human habitation and every other structure or condition located within the same lot line whose

---

[8] Defendants urge that the Attorney General's guidance about community owners' maintenance responsibilities is "wholly unsupported by, and, indeed, contrary to, the very regulation that it purports to clarify and interpret." Doc. No. 30 at 13. But the Attorney General's guidance is entirely consistent with the regulations' prohibition on requiring residents to maintain homesite infrastructure and the Sanitary Code's imposition of a maintenance duty on community owners, which is incorporated by reference into the regulations. As "an agency's interpretation of its own regulations," it is therefore entitled to "considerable deference unless it is arbitrary, unreasonable, or inconsistent with the plain terms of the regulations themselves." Doe v. Sex Offender Registry Bd., 999 N.E.2d 478, 484–85 (Mass. 2013). In any event, the Court's ruling rests upon the language of the relevant statutes and regulations, which are plainly law, not the explanatory Guides. The Court notes that defendants have stated that they "will continue to abide by [the guidance] as necessary and feasible under a complete reservation of rights pending the outcome of this civil action." Doc. No. 30 at 16 n.26.

existence causes or is likely to effect noncompliance with the provisions of" the Sanitary Code. Id. As "structure[s] or condition[s] located within the . . . lot line," the permanent elements of plaintiffs' homesites that the plaintiffs do not own and are instead leased from Hometown plainly fall within the definition of dwelling as the Code defines that term.[9]

Defendants argue that, because the Sanitary Code obligates an "owner" to maintain "his dwelling," its plain text does not impose maintenance obligations on community owners for the structural elements of residents' "dwellings," because the manufactured homes are not owned by the community owners. Doc. No. 51 at 3–4. But the Sanitary Code defines "dwelling" to include "every . . . structure or condition located within the same lot line" as a "building or shelter . . . used or intended for human habitation." 105 Mass. Code Regs. 410.020. The homesite infrastructure surrounding residents' homes is therefore a "dwelling" within the meaning of the Sanitary Code.[10] The Amended Complaint alleges that the defendants own the land on which each community sits. Doc. No. 10 ¶¶ 46, 74. To the extent that community owners own the

---

[9] Although plaintiffs' Amended Complaint notes that "the owners of manufactured housing communities generally do not lease any structures to their tenants," Doc. No. 10 ¶ 2, it also refers to "the structures built into [Craw's] home site," id. ¶ 15, and "the structures built into [Shurtleff's] home site," id. ¶ 19. The Court does not interpret ¶ 2 as a concession that there exist no structures owned by defendants on plaintiffs' homesites. In any event, the defendants advanced no such argument.

[10] The Sanitary Code defines "owner" as one who "has legal title to any dwelling, dwelling unit, mobile dwelling unit, or parcel of land, vacant or otherwise, including a mobile home park." 105 Mass. Code Regs. 410.020. The defendants argue that the phrase "including a mobile home park" in this definition modifies only "parcel of land," not the entire series of nouns. Doc. No. 51 at 4. This argument fails on its face. Under any construction of the definition, defendants are clearly an "owner" within its meaning. Plaintiffs' homesites are clearly "dwellings" under the Sanitary Code's definition, as described above, and the Amended Complaint alleges that Hometown owns the homesites. Even if "including a mobile home park" modified exclusively "parcel of land," that would not, on its own, exclude Hometown from the coverage of 105 Mass. Code Regs. 410.500, given that Hometown is therefore plainly the homesites' "owner" within the meaning of the Sanitary Code.

homesites and infrastructure thereon, the Sanitary Code thus requires them to maintain the portions they own.[11]

The provisions of the Sanitary Code that impose duties on manufactured housing community owners are therefore persuasive support that the Manufactured Housing Act regulations themselves impose a duty to maintain the permanent improvements. These Sanitary Code provisions long predated the Manufactured Housing Act regulations.[12] The Attorney General's various Guides demonstrated his or her specific awareness of the regulations, supporting the conclusion that the Attorney General drew upon these existing regulatory requirements and intended them to work in tandem.[13] See Dowell v. Comm'r of Transitional Assistance, 677 N.E.2d 213, 216 (Mass. 1997) ("Provisions of legislation addressing similar

---

[11] Plaintiffs' supplemental brief addresses the precise division of ownership of the structures and conditions within each homesite between plaintiffs and defendants. See Doc. No. 58 at 2–4. That question is, at least in part, one of fact, and the Court cannot resolve it at this stage. Its resolution may ultimately bear on the scope of defendants' duty. However, because plaintiffs have alleged, and defendants do not dispute, that defendants own at least the land beneath each homesite—and therefore that they own at least some structures and conditions within each homesite—its resolution is also unnecessary at this point.

[12] Defendants also argue that the Attorney General's guidance could only apply prospectively from its issuance in November 2017. Doc. No. 30 at 19. But, as discussed above, the Attorney General has described the Sanitary Code's application to manufactured housing communities in a manner consistent with its present guidance since at least 1983. See 1983 Guide at 15–16. As a result, the guidance is neither new nor a departure from underlying law. In any event, the Court's ruling derives from the relevant statutes and regulations. Defendants' argument that certain challenged statements in the various Guides are unmoored from governing law is simply not supported by an examination of the relevant regulations, statutes, and underlying common law of Massachusetts.

[13] Defendants argue that, because plaintiffs' Amended Complaint does not mention the Sanitary Code, they are not now entitled to rely upon it. Doc. No. 51 at 2–3. The complaint does, however, state causes of action under the Manufactured Housing Act and the Consumer Protection Act, which both incorporate the Sanitary Code. Plaintiffs may therefore cite the Sanitary Code as legal authority relevant to the claims advanced in the complaint. The cases defendants advance in support of this argument, which discuss attempts to add entirely new causes of action or factual allegations to overcome motions to dismiss, are not to the contrary.

subject matter are to be construed together to make an harmonious whole consistent with the legislative purpose and to avoid rendering any part of the legislation meaningless").

Defendants' proposed interpretation of the Manufactured Housing Act regulations—that they impose no duty on defendants to maintain homesite infrastructure—leads to an absurd result. The Amended Complaint alleges that the Policy shifts onto residents the burden of maintaining "permanent improvements built into the land on those residents' leased home sites," including "the cement slab upon which many residents' homes sit." Doc. No. 10 ¶¶ 8, 10. On the facts alleged in the Complaint, defendants own these permanent improvements. See Meeker v. Oszust, 30 N.E.2d 246, 248 (Mass. 1940) (default rule is that fixtures merge into the realty). The Attorney General's 1996 regulations barred community owners from requiring homeowners to maintain these improvements. 940 Mass. Code Regs. 10.04(5)(f). In these circumstances, the conclusion that the defendants bear no duty whatsoever to maintain these permanent improvements that they own would lead to the absurd result that *no one* bears the duty to maintain these improvements, despite their plain importance to manufactured homes. That, in turn, would lead to precisely the outcome that the regulations are intended to prevent—that homeowners whose homesite infrastructure requires repair would ultimately be forced to make the repairs themselves. An interpretation that results in these outcomes is contrary to the Supreme Judicial Court's command to interpret statutes "so as to render the legislation effective, consonant with sound reason and common sense." Harvard Crimson, Inc., 840 N.E.2d at 522.

Defendants advance another argument based on the text of the relevant regulations. They point to the Manufactured Housing Act regulations' provision that community owners "shall not perform or charge a resident for maintenance work on the resident's manufactured home or home site, unless requested by the resident" or in certain other circumstances. Doc. No. 30 at 11–12;

940 Mass. Code Regs. 10.04(5)(d). They argue that, while this provision clearly *allows* maintenance in certain circumstances, its existence and phrasing are evidence that there exists no *requirement* that community owners must do so. Doc. No. 30 at 12. But this regulation speaks to ordinary activities "to keep neat and in good repair . . . the manufactured home site," which the regulations permit community owners to shift to residents under some circumstances. See 940 Mass. Code Regs. 10.04(5)(a). It does not address residents' duties regarding "permanent improvements," which community owners may not require residents to perform. Id. 10.04(5)(f).

Accordingly, defendants' argument that they had no duty to maintain the permanent infrastructure on plaintiffs' homesites fails. Count I states a claim on both theories advanced.

        2.      <u>Other Arguments</u>

Defendants challenge Count I, and some of the other Counts in the Amended Complaint, on grounds different than whether the defendants owed a legal duty to Plaintiffs. Each is addressed below.

        a.      <u>Statute of Repose</u>

The defendants also argue that Count I is barred by Massachusetts's six-year statute of repose for any tort action "arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property." Mass. Gen. Laws ch. 260, § 2B; Doc. No. 30 at 20. For two separate reasons, this argument fails no matter when plaintiffs' claims arose. First, the protections of § 2B extend "only to the kinds of economic actors who perform acts of individual expertise akin to those commonly thought to be performed by architects and contractors—that is to say, to parties who render particularized services for the design and construction" of improvements to real property. <u>Dighton v. Fed. Pac. Elec. Co.</u>, 506 N.E.2d 509, 515 (Mass. 1987) (internal quotation omitted). The defendants are sued in their role

as owner and operator of Oakpoint and Oak Hill, not as the providers of design or construction services. Accordingly, they plainly do not fit within this class and therefore cannot avail themselves of the protection of the statute of repose. Second, § 2B is inapplicable to plaintiffs' claims that the defendants failed to maintain their homesite infrastructure, which stem from their agreement with Hometown and therefore sound in contract, not in tort. Plaintiffs claim that the defendants failed to provide them the bargained-for benefit of their lease—namely, properly maintained homesite infrastructure—not that defendants' conduct was negligent. See Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 684 (Mass. 2013) (finding that Chapter 93A claims sounded in contract where the complaint alleged conduct depriving plaintiff of contractual rights); cf. Scott v. Garfield, 912 N.E.2d 1000, 1005 (Mass. 2009) (although the implied warranty of habitability "encompasses contract and tort principles," a tenant may recover for economic loss resulting from landlord's breach, because those claims arise from their lease contract, not the principles of tort law).[14]

b.    <u>Craw's Lease Agreement</u>

With respect to Craw, the defendants also argue that her claims under Court I against Hometown Oakhill are barred by the terms of her lease agreement. Doc. No. 30 at 21–22. Craw's lease agreement provides that Hometown Oakhill "is not liable for damage or loss of RESIDENT . . . for personal injury or damage or loss of property . . . from fire, smoke, rain, flood, water leaks, hail, ice, snow . . . unless that injury or damage is caused by the gross negligence or willful

---

[14] Defendants' citations to <u>Bridgwood v. A.J. Wood Constr., Inc.</u>, 105 N.E.3d 224 (Mass. 2018), and <u>Stearns v. Metro. Life Ins. Co.</u>, No. SJC-12544, 2019 WL 984038, at *1 (Mass. Mar. 1, 2019), are unavailing. <u>See</u> Doc. No. 51 at 5; Doc. No. 57 at 4. <u>Bridgwood</u> held that a claim that a building contractor's negligent electrical rehabilitation work resulted in property damage sounded in tort because it was "indistinguishable from a claim of negligence." 105 N.E.3d at 231. <u>Stearns</u> also addressed a personal injury claim that sounded in tort. In this case, unlike the claims in <u>Bridgwood</u> and <u>Stearns</u>, plaintiffs' claim sounds in contract.

misconduct of" Hometown Oakhill. Doc. No. 30-3 ¶ 12. Assuming without deciding that the provisions of Craw's lease agreement remain in effect even after the five-year term stated on the face of the agreement, see id. at 3, the liability release provision is, as Craw argues, void because it violates public policy, see Doc. No. 44 at 16. The Manufactured Housing Act regulations provide that a lease provision "which releases or limits the operator's liability arising under law or resulting from an act or omission of the operator" is "void and unenforceable." 940 Mass. Code Regs. 10.03(9)(b). Accordingly, this argument fails.

c.    Scope of Claims

Defendants argue that, because each named plaintiff purports to state claims against the manufactured housing community in which she did not live—i.e., Craw against Hometown Oak Point, and Shurtleff against Hometown Oakhill—and, because the named plaintiffs cannot have suffered injury at the hands of a community in which they never resided, those claims must be dismissed. Doc. No. 30 at 22. Defendants specify that they intend to raise only an issue of pleading, rather than one "of class action typicality and standing." Doc. No. 51 at 6.[15]

Indeed, the headings on each claim of the Amended Complaint state that each claim is made "BY BARBARA CRAW AND JOAN SHURTLEFF," without distinguishing between the two as to each of the defendant entities. See Doc. No. 10 ¶¶ 121–153. However, the extensive facts alleged in the Amended Complaint make clear that each of the named plaintiffs allege that

---

[15] Of course, the Court has an independent duty to ensure that standing exists. "In a class action suit with multiple claims, at least one named class representative must have standing with respect to each claim." William Rubenstein, 1 Newberg on Class Actions § 2:5 (5th ed.). Because that basic standing requirement is clearly satisfied in this case, the Court does not, at this point, perceive any issue related to standing. At any rate, "class certification issues are . . . logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing." Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999). Accordingly, the Court may, if necessary, revisit this issue at an appropriate time.

they lived in only one of the two manufactured housing communities at issue in this case. None of the facts suggest that Craw alleges injury caused by Hometown Oak Point or that Shurtleff alleges injury caused by Hometown Oakhill. Further, defendants offer no authority for their claim that "[e]ach plaintiff must be able to state a claim against each specific defendant." Doc. No. 51 at 6. As a result, although issues similar to this one may arise at the class certification stage, defendants' argument that plaintiffs' claims are impermissibly broad fails at this point.

### d.  Sufficiency of Class Allegations

Finally, defendants argue that the plaintiffs' Amended Complaint fails to allege sufficiently a class under Fed. R. Civ. P. 23(b)(2). Doc. No. 30 at 22. To survive a motion to dismiss a class action, "a plaintiff must properly allege a factual basis showing that there are similarly situated persons entitled to relief . . . and/or that common issues of fact predominate sufficiently to satisfy the traditional Fed. R. Civ. P. 12(b)(6) standard." Cavallaro v. UMass Mem'l Health Care, Inc., 971 F. Supp. 2d 139, 152 (D. Mass. 2013). In this case, plaintiffs have alleged that the defendants adopted a policy of shifting onto residents the burden of maintaining homesite infrastructure. Doc. No. 10 ¶ 8. The Amended Complaint is replete with factual allegations that defendants adopted this policy and applied it to all residents of Oakhill and Oak Point—indeed, even making public statements to that effect. See, e.g., id. ¶¶ 62, 64, 73, 83–84, 88–89, 92, 94. Drawing all inferences in plaintiffs' favor, as the Court must at the motion to dismiss stage, these factual contentions "sufficiently allege[s] that members of the alleged class were subject to a uniform policy that violated" their legal rights, therefore "creat[ing] a plausible entitlement to relief by putative class members to survive a motion to dismiss." Cavallaro, 971 F. Supp. 2d at 152–53.

Because each of defendants' arguments for dismissing Count I fails, the motion to dismiss is DENIED with respect to Count I.

B.    Count II

With respect to Count II, defendants argue that the plaintiffs' claims are solely "duplicative" of those made by Count I and do not independently allege conduct that is unfair or deceptive. Doc. No. 30 at 16–17. As a result, defendants argue, Count II is insufficient to state an independent violation of the Consumer Protection Act. Id. Moreover, defendants argue, because "[t]he Attorney General has comprehensively regulated conduct by community operators . . . Hometown is entitled to rely upon compliance with properly promulgated official regulations," apparently as per se evidence that its conduct is not unfair or deceptive. Id. at 17. These arguments about Count II fail for three reasons.

First, the plaintiffs' Amended Complaint alleges unfair or deceptive conduct sufficient to state a claim under the Consumer Protection Act without the support of the Manufactured Housing Act. The plaintiffs argue that Hometown and its affiliates adopted a policy of refusing to maintain the infrastructure on their homesites, instead informing them on several occasions that such maintenance was their responsibility, thereby depriving them of the benefits of their homes that they reasonably expected and thus causing them economic injury. Doc. No. 10 ¶¶ 62, 64, 73, 83–84, 99. As discussed above, this policy violated Hometown's duty to plaintiffs under the Sanitary Code, which violation itself is defined by regulation as an unfair or deceptive act within the meaning of the Consumer Protection Act. See 940 Mass. Code Regs. 3.17(1)(i). Because the economic injuries that plaintiffs allege resulted from Hometown's policy are "a distinct injury or harm that arises from the claimed unfair or deceptive act itself," Count II states

a valid claim under the Consumer Protection Act. <u>Tyler v. Michaels Stores, Inc.</u>, 984 N.E.2d 737, 746 (Mass. 2013).[16]

Second, the Attorney General's regulations promulgated under the Consumer Protection Act provide a basis independent from the Sanitary Code and the Manufactured Housing Act for Hometown's duty to maintain plaintiffs' homesite infrastructure.[17] Those regulations make it an unfair or deceptive act for "an owner to . . . [f]ail, during the terms of the tenancy, after notice is provided . . . to . . . maintain the dwelling unit in a condition fit for human habitation." 94 Code Mass. Regs. 3.17(1)(b). The regulations define "owner" as "[a]ny person who holds title to one or more dwelling units in any manner including but not limited to a partnership, corporation or trust," while they define "dwelling unit" as "[a]ny building or structure, or any unit therein or part thereof, and all the common areas inside and outside such building or structure, occupied or intended for occupancy as a residence by one or more individuals; including a mobile home or a lot therefor." <u>Id.</u> 3.01. Finally, the regulations define "tenancy" as "[o]ccupation or use of a dwelling unit under a rental agreement." <u>Id.</u>

---

[16] Defendants complain that Count II merely duplicates the Chapter 93A violations alleged in Count I and thus must be dismissed. Doc. No. 30 at 16. Certainly, the operative paragraphs of Count I with respect to Chapter 93A are mirrored in Count II. <u>Compare</u> Doc. No. 10 ¶¶ 124–126 <u>with</u> <u>id.</u> ¶¶ 133–135. However, as described above, the language of Count I indicates that the Chapter 93A violation it alleges arises from the violation of the Manufactured Housing Act and its regulations, <u>id.</u> ¶ 125, while Count II alleges a direct violation of Chapter 93A, <u>id.</u> ¶ 134. In any event, duplication between the two counts can be addressed at a later stage of the proceeding.

[17] Because the Consumer Protection Act regulations incorporate the Sanitary Code, plaintiffs state a valid claim under the Consumer Protection Act without the aid of the Manufactured Housing Act. That conclusion suffices for the purpose of considering the motion to dismiss Count II. However, the regulations also define other unfair and deceptive acts in the landlord-tenant context that Hometown's policy, as alleged, may violate. <u>See, e.g.</u>, 940 Mass. Code Regs. 3.17(1)(b)(2). Such provisions may, at a later stage in this litigation, be relevant to the scope of defendants' duty to plaintiffs.

As lots for mobile homes, the homesites upon which plaintiffs' manufactured homes sit are clearly "dwelling units" within the regulations' definition. Because the defendants own the homesites, they are an "owner." Finally, because the plaintiffs occupy their homesites—which are dwelling units—under a rental agreement, their relationship with the defendants is a "tenancy" within the meaning of the regulations. The Amended Complaint contains several factual allegations about conditions at Craw and Shurtleff's homesites about which they notified Hometown and which, as alleged, could plausibly have rendered them unfit for human habitation. See, e.g., Doc. No. 10 ¶¶ 53–57, 97, 102. Accordingly, to the extent that Hometown failed to comply with 94 Code Mass. Regs. 3.17(1)(b), Count II states plausibly a valid claim.

Finally, the Attorney General's Manufactured Housing Act regulations do not, as defendants argue, protect them from Consumer Protection Act claims. The defendants bear the burden of proving that their conduct is covered by the Consumer Protection Act's "safe harbor" exemption for "transactions or action otherwise permitted under laws as administered by a regulatory board or officer acting under statutory authority of the commonwealth or of the United States." Mass. Gen. Laws ch. 93A, § 3; Aspinall v. Philip Morris, Inc., 902 N.E.2d 421, 424 (Mass. 2009). "To sustain that burden, [defendants] 'must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, [they] must show that such scheme affirmatively permits the practice which is alleged to be unfair or deceptive.'" O'Hara v. Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 453–54 (D. Mass. 2018) (quoting Bierig v. Everett Sq. Plaza Assocs., 611 N.E.2d 720, 728 (Mass. App. Ct. 1993)). Defendants have made no such showing. Nor could they, given that the regulatory

scheme at issue here does not relieve community owners of any duty to maintain homesite infrastructure; rather, it imposes one.[18]

Defendants' arguments about the statute of repose, the purported liability waiver in Craw's lease agreement, the scope of the claims, and the sufficiency of the class allegations fail with respect to Count II for the same reasons they fail as to Count I. Accordingly, because each of defendants' arguments for dismissing Count II fails, the motion to dismiss is DENIED with respect to Count II.

C.     Count III

Defendants argue that Count III fails as a matter of law because plaintiffs do not cite a provision of any lease agreement that any defendant breached. Doc. No. 30 at 18. However, under Massachusetts law,

> a lease is essentially a contract between the landlord and the tenant wherein the landlord promises to deliver and maintain the demised premises in habitable condition and the tenant promises to pay rent for such habitable premises. These promises constitute interdependent and mutual considerations. Thus, the tenant's obligation to pay rent is predicated on the landlord's obligation to deliver and maintain the premises in habitable condition. . . . This means that at the inception of the rental there are no latent (or patent) defects in facilities vital to the use of the premises for residential purposes and that these essential facilities will remain during the entire term in a condition which makes the property livable. This

---

[18] Defendants further argue that they were entitled to rely on Attorney General's approval of community rules for Oakhill and Oak Point. Doc. No. 30 at 17. But these community rules do not discuss who has responsibility for maintaining homesite infrastructure. See Doc. Nos. 49-10, 49-11. As a result, they do not evidence affirmative permission for requiring residents to maintain permanent homesite infrastructure, as would be required to trigger the safe harbor.

warranty (in so far as it is based on the State Sanitary Code and local health regulations) cannot be waived by any provision in the lease or rental agreement.

Hemingway, 293 N.E.2d at 842–43. "At a minimum, this warranty imposes on the landlord a

duty to keep the dwelling in conformity with the State Sanitary Code." Simon v. Solomon, 431

N.E.2d 556, 561 (Mass. 1982).[19]

Plaintiffs argue that their lease agreements with defendants are contracts which, as a

matter of law, contain this implied warranty of habitability, a term breached by defendants'

refusal to maintain their homesite infrastructure. See Doc. No. 10 ¶ 141; Doc. No. 44 at 7; Doc.

No. 55 at 73. Although defendants contend that the homesites they lease to plaintiffs are not

dwellings within the meaning of Hemingway's implied warranty, this argument fails for the

reasons described above.[20]

Defendants' arguments about the purported liability waiver in Craw's lease agreement,

the scope of the claims, and the sufficiency of the class allegations fail with respect to Count III

for the same reasons they fail as to Count I. Accordingly, because each of defendants' arguments

for dismissing Count III fails, the motion to dismiss is DENIED with respect to Count III.

---

[19] Defendants cite Gen. Motors Corp. v. Romein, 503 U.S. 181, 189 (1992) for the proposition that "not . . . all state regulations are implied terms of every contract entered into while they are effective." Doc. No. 57 at 5–6. But the very next sentence of that case states that "[f]or the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts." Id. In Massachusetts, the implied warranty of habitability affects the construction of residential lease contracts and is therefore implied into plaintiffs' lease agreements. Hemingway, 293 N.E.2d at 842.

[20] Defendants also advance a case from Northeast Housing Court for the proposition that manufactured housing community operators do not have a duty to remediate issues in manufactured homes that arise when such homes settle over time. Doc. No. 57 at 3; William A. Cole Realty Trust v. Day, Case No. 09-SP-1987 (Mass. Hous. Ct. July 6, 2011). The existence of such a duty is not at issue in this case, which raises the question of an operator's duty to maintain homesite infrastructure which the operator owns. The Housing Court case defendants cite states that "the common law implied warranty of habitability [discussed in Hemingway] applies to land, facilities, and services of manufactured housing communities." Id. at 5.

D.    <u>Count IV</u>

Defendants argue that Count IV fails as a matter of law because plaintiffs' claim that defendants violated the Quiet Enjoyment Statute, Mass. Gen. Laws ch. 186, § 14, is premised on their claim that defendants had a legal duty to maintain plaintiffs' homesite infrastructure, which defendants again argue they do not have. Doc. No. 30 at 18–19.

As discussed above, defendants in fact have such a duty in at least three independent ways—under the Manufactured Housing Act and its regulations, under the Sanitary Code, and under the Consumer Protection Act regulations. The Quiet Enjoyment Statute separately imposes yet a fourth duty to maintain plaintiffs' homesites. "[A] landlord violates § 14 when his acts or omissions impair the value of the leased premises. A landlord's failure to repair defects of which he has notice in leased premises is an omission which frequently has been deemed to violate § 14. A landlord's conduct, and not his intentions, is controlling." <u>Cruz Mgmt. Co. v. Thomas</u>, 633 N.E.2d 390, 395 (Mass. 1994) (internal quotations and citations omitted); <u>see also</u> <u>Simon v. Solomon</u>, 431 N.E.2d 556, 566 (Mass. 1982) (allowing action under the Quiet Enjoyment Statute a landlord "violated its underlying duty to maintain sanitary conditions . . . and thereby permitted repeated flooding to occur"); <u>Clark v. Leisure Woods Estates, Inc.</u>, 45 N.E.3d 908, 911 (Mass. App. Ct. 2016) (upholding a damages award against a manufactured housing community operator for "breaches of the covenant of quiet enjoyment with respect to the plaintiffs' individual home sites," including because of flooding due to "the defendant's failure to address the crumbling infrastructure of the lots").[21]

---

[21] The Court notes that it cannot and does not at this stage determine the differences, if any, in the precise scope of the duties imposed on defendants by the Sanitary Code, the Manufactured Housing Act regulations, the Consumer Protection Act regulations, and the Quiet Enjoyment Statute. For the purposes of the motion to dismiss, the Court holds only that plaintiffs' Amended Complaint has plausibly stated breaches of each of those duties.

Defendants' arguments about the purported liability waiver in Craw's lease agreement, the scope of the claims, and the sufficiency of the class allegations fail with respect to Count IV for the same reasons they fail as to Count I. Accordingly, because each of defendants' arguments for dismissing Count IV fails, the motion to dismiss is DENIED with respect to Count IV.

IV.    CONCLUSION

Defendants' motion to dismiss also raises arguments about the nature of the relief sought by plaintiffs, the potential conflict between Mass. Gen. Laws ch. 93A and Fed. R. Civ. P. 23, and the typicality of the proposed class. See Doc. No. 30 at 22–25. These arguments raise issues of class certification that do not bear on whether plaintiffs have stated a claim upon which relief can be granted within the meaning of Fed. R. Civ. P. 12(b)(6). As such, they are premature, and the Court need not address them at this point. Accordingly, for the reasons stated above, the defendants' motion to dismiss, Doc. No. 29, is DENIED in its entirety.

Plaintiffs have also moved for class certification, Doc. No. 11, and for partial summary judgment, Doc. No. 42. Earlier Orders of the Court extended defendants' deadlines to oppose those motions until after the resolution of the present motion. Doc. Nos. 38, 48. Accordingly, by April 1, 2019, the parties shall file a joint status report setting forth their joint or separate positions on a schedule for the remainder of this litigation, including a briefing schedule for the two pending motions and the class questions described above.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge