UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

BARBARA CRAW, *et al.*,                     X
                                            X
Plaintiffs,                                 X        **CASE NO: 18-CV-12149-LTS**
                                            X
vs.                                         X
                                            X
HOMETOWN AMERICA, LLC, *et al.*,            X
                                            X
Defendants.                                 X
_____   X

## DECLARATION OF DR. BRENT LUTES

I, Dr. Brent Lutes, state that the following facts are true and accurate, based on my personal knowledge, and that I am competent to testify to the truth and accuracy of the same:

1.      I am an economist and Senior Associate in the Boston office of The Brattle Group, a global economic consulting firm.

2.       My expertise includes the valuation of commercial damages and the economic analysis of intellectual property and other intangible assets.

3.      I received a PhD in economics from the University of California, Irvine, where my research focused on, among other things, the economic concerns of land-use regulation.

4.      I have more than 10 years' experience researching and analyzing economic issues that pertain to regulatory and legal matters.

5.      I have conducted dozens of damages analyses and prepared expert reports in matters that span a broad spectrum of topics and industries.

6.      I frequently advise regulatory bodies and have participated in a number of regulatory proceedings.

7.      I have been asked by the Northeast Justice Center to provide my expert opinion in the above-captioned matter with respect to economic injury and damages (if any) experienced by

1

residents of the Oakhill manufactured housing community who did not receive services that are supposed to be provided to them by the owner of that community ("Craw Report").

8. I have agreed to provide my opinion on this matter *pro bono*.

9. I have been assisted by my colleagues at the Brattle Group who worked under my direction and who are also working on a *pro bono* basis.

10. Neither the Brattle Group nor I have any financial interests contingent on my opinion or the outcome of the above-captioned matter.

11. I was in the process of drafting the Craw Report when I learned of the proposed settlement in the above-captioned matter.

12. Although I did not complete the Craw Report or finalize my opinions contained therein, they are substantially similar to the report and opinions that I authored concerning the economic injuries sustained by residents of other manufactured housing community residents, under circumstances similar to those alleged in the above-captioned litigation, for the matter *Layes, et al. v. RHP Properties, Inc., et al.* – 20-CV-10721-RWZ (D. Mass.) ("Layes Report").

13. I affirm that my opinions expressed in the Layes Report (**Exhibit A**) are true and accurate to the best of my knowledge, are generally applicable to manufactured housing communities in the Commonwealth of Massachusetts, are based on my expertise described above as well as in **Exhibit A** and are the product of the reliable application of reliable economic principles and methods to the materials I have reviewed.

14. While I did not finish my analysis in the Craw Report, I did estimate the range of economic damages suffered by the putative class of Oakhill residents that Ms. Craw seeks to represent – based on materials obtained by Ms. Craw in formal discovery as well as informally during settlement negotiations – and determined that range to be between $110,000 and $565,000.

I affirm that the foregoing is true and accurate, to the best of my personal knowledge, and do so under the pains and penalties of perjury. Executed this 2nd day of December, 2020, by:

Dr. Brent Lutes

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROSA LAYES, on behalf of herself and other similarly situated individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> RHP PROPERTIES, INC., a Michigan corporation and CHELMSFORD GROUP, LLC, a Delaware limited liability company, <br><br> Defendants. | )<br>)<br>)<br>)<br>)  CASE NO: 20-CV-10721-RWZ<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**EXPERT REPORT**

**OF**

**DR. BRENT LUTES**

**ON BEHALF OF**
**PLAINTIFFS**

May 11, 2020

**TABLE OF CONTENTS**

I.      Introduction and Qualifications ..................................................................................1

II.     Assignment and Summary of Conclusions ...............................................................1

        A.    Assignment ...................................................................................................... 2

        B.    Summary of Conclusions ................................................................................. 3

III.    Background ................................................................................................................4

        A.    Parties .............................................................................................................. 4

        B.    Manufactured Home Communities ................................................................. 5

        C.    Home Oil Heating Systems ............................................................................. 9

IV.     Putative Class Members Suffered Economic Injury as a Result of the
        Defendants' Failure to Maintain External Components of Home Oil Heating
        Systems.....................................................................................................................10

        A.    Putative Class Members  Paid the Defendants for Home Oil Heating System
              Maintenance Services .................................................................................... 11

        B.    Home Oil Heating System Maintenance Service Has Economic Value ................ 12

              1.   The Value Underlying Home Oil Heating System Maintenance Service is Risk
                   Avoidance, which is Well-Recognized by Economists to Have Tangible Value .. 14

              2.   The Value of Home Oil Heating System Maintenance Service is Evident from the
                   Robust Markets for Those Services.......................................................... 18

V.      Damages Can be Reliably Estimated using Well-Established Economic
        Principles Combined with Information that is or will Likely Become Available...19

VI.     Damages Can be Calculated Based on Evidence Common to All Putative Class
        Members ...................................................................................................................23

VII.    Conclusions ..............................................................................................................24

i

## I.    INTRODUCTION AND QUALIFICATIONS

1. I am Dr. Brent Lutes, an economist and Senior Associate in the Boston office of The Brattle Group, a global economic consulting firm. I have been asked by the Northeast Justice Center ("Counsel") to provide my expert opinion with respect to economic injury and damages (if any) in the matter of Rosa Layes versus RHP Properties, Inc. and Chelmsford Group, LLC.[1]

2. My expertise includes the valuation of commercial damages and the economic analysis of intellectual property and other intangible assets. I received a PhD in economics from the University of California, Irvine, where my research focused on, among other things, the economic concerns of land-use regulation. I have more than 10 years' experience researching and analyzing economic issues that pertain to regulatory and legal matters. I have conducted dozens of damages analyses and prepared expert reports in matters that span a broad spectrum of topics and industries. I frequently advise regulatory bodies and have participated in a number of regulatory proceedings. My professional experience and qualifications are listed in my CV, attached at Appendix A.

3. I have agreed to provide my opinion on this matter *pro bono*. I have been assisted by my colleagues at the Brattle Group who worked under my direction, who are also working on a *pro bono* basis. Neither the Brattle Group nor I have any financial interests contingent on my opinion or the outcome of the case. I have listed the materials on which I relied in Appendix B. I understand that fact discovery may be ongoing in this matter, and I therefore reserve the right to amend my opinions if additional relevant information becomes available.

## II.    ASSIGNMENT AND SUMMARY OF CONCLUSIONS

4. I have been advised by Counsel that this matter pertains to a dispute between certain residents ("Plaintiffs" or the "Putative Class") of the manufactured home community ("MHC") known as Chelmsford Commons Manufactured Housing Community

---

[1]    *Rosa Layes v. RHP Properties, Inc.,* No. 1:20-cv-10721-RWZ (United States District Court, District Court of Massachusetts).

("CCMHC") and the owner/operators of CCMHC, RHP Properties, Inc. ("RHP") and Chelmsford Group LLC ("CG") (together with RHP, the "Defendants"). I understand that Plaintiffs claim that CCMHC has failed to provide minimum levels of maintenance required by Massachusetts State law, with respect to external components of home oil heating systems ("HOHSs") between April of 2011 and October of 2017[2] (the "Damages Period"). Accordingly, Plaintiffs are seeking damages to remedy the economic injury suffered as the result of the Defendants' lapsed maintenance.[3]

5.  I understand CCMHC is a 255-unit MHC in Chelmsford Massachusetts,[4] which houses mainly low- and middle-income families,[5] and is primarily comprised of single-section manufactured homes.[6] The Defendants purchased and took over operation of CCMHC in April of 2011.[7] I have been advised that most of the manufactured homes in CCMHC rely on HOHSs as their primary source of heat, and such systems require regular maintenance in order to operate safely and reliably.[8] I have also been advised that Massachusetts law requires MHC operators to maintain the portion of HOHSs that are outside of a manufactured home, the primary component of which is the oil storage tank.

### A.  ASSIGNMENT

6.  Counsel has asked for my opinion with respect to the following:

---

[2]  Notice of Removal, *Rosa Layes v. RHP Properties Inc.,* No. 1:20-cv-10721-RWZ, April 13, 2020, at ¶35.

[3]  First Amended Class Action Complaint, *Rosa Layes v. RHP Properties Inc.,* No. 1581CV02722-C, March 25, 2020 ("Complaint"), at ¶74.

[4]  RHP Properties, "Chelmsford Commons Sitemap," accessed May 7, 2020, available at: https://public.rhp-properties.com/newbury/site_maps/sitemap_Chelmsford_Commons.pdf.

[5]  Complaint, at ¶2.

[6]  MHVillage, "Chelmsford Mobile Home Park," accessed May 4, 2020, available at: https://www.mhvillage.com/parks/14686.

[7]  Complaint, at ¶¶24-25.

[8]  *See* Joseph Carbone Deposition, 107:09-108:02, June 1, 2016. *See also* Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. iv, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e 29-2876-7299-5f7d-edd84589c5f1&forceDialog=0. *See also* Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, Attachments A & B, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Gui de.pdf.

a.  Whether Plaintiffs have been economically harmed or injured by the Defendants' failure to provide the minimal services required with respect to HOHSs;

b.  The extent to which damages related to the Putative Class of CCMHC residents (should damages be warranted) can be readily calculated based on well-established economic principles and information that is, or will likely become, available; and

c.  The extent to which damages (should damages be warranted) can be calculated based on evidence that is common to all members of the Putative Class.

7.  For the purposes of this affidavit, Counsel has instructed me to assume that CCMHC has acted as stated in the complaint submitted by Plaintiffs and is liable for the economic injury to Plaintiffs (if any) caused by those actions.[9]

## B.  SUMMARY OF CONCLUSIONS

8.  Given my understanding of the facts of this matter as described above, my opinions with respect to the questions posed by Counsel are:

a.  Putative Class members have suffered economic injury insofar as they paid for economically valuable HOHS maintenance services that they did not receive. This is because the cost of such service would have been factored into the site rental fees the Defendants charged CCMHC residents. Hence, members of the Putative Class paid the Defendants for services that were ultimately not provided. Those services have tangible economic value. The economic driver of that value is risk and cost avoidance. The substantiality of that value is evident from the well-developed market for similar services. The fact that Plaintiffs paid for economically valuable services as part of their site rental fees and did not receive those services means that they were overcharged. That overcharge constitutes an injury from an economic perspective. I discuss these points further in Section IV.

---

[9]  *See* Complaint.

b. The damages related to the economic injury suffered by Plaintiffs can be thought of as the amount by which Plaintiffs were overcharged for their site rental fees. This figure can be estimated by examining the standalone value of HOHS maintenance services Defendants should have, but did not, provide, using information that is currently (or will likely become) available. As a benchmark, currently available evidence suggests that the total market value for HOHS maintenance services that are closely related to those Defendants were required to, but did not, provide ranges from $165,750 to $828,750 depending on, among other things, the breadth and frequency of service. I discuss these points further in Section V.

c. Damages can be calculated based on evidence that is common to all members of the Putative Class. This is because, from an economic perspective, all Putative Class members would be entitled to the market value of the deficient services, and that value in a given period for a given set of services is common to all relevant Putative Class members. I discuss these points further in Section VI.

## III. BACKGROUND

### A. PARTIES

9. I understand that Plaintiffs in this matter are Ms. Rosa Layes and other similarly situated individuals, who together constitute the Putative Class. Members of the Putative Class are individuals who resided in CCMHC and paid site rental fees to the Defendants over all, or some portion of, the Damages Period.[10]

10. I understand Defendant CG is a legal entity owned by RHP and was established in January of 2011 for the sole purpose of purchasing CCMHC.[11] I also understand that CG has no employees of its own and instead relies on employees of RHP to manage and operate CCMHC.[12]

---

[10] Complaint, at ¶75.

[11] Complaint, at ¶23.

[12] Complaint, at ¶25.

11. Defendant RHP bills itself as "the nation's largest private owner and operator of manufactured home communities,"[13] and holds the overall third largest share of the MHC market.[14] RHP owns 256 MHCs with more than 64 thousand housing units across 27 states.[15] The estimated value of RHP's portfolio of MHCs is $4 billion.[16] Last year RHP generated about $512 million in revenue and earned an estimated $285 million in profits (a profit margin of about 56%).[17]

### B.    MANUFACTURED HOME COMMUNITIES

12. Manufactured homes are prefabricated structures typically assembled at a centralized facility before being installed at a home-site.[18] These are often colloquially referred to as "mobile homes;" however, that term can be misleading insofar as manufactured homes are not typically relocated after their initial installation.[19] While manufactured homes are physically capable of being relocated, moving costs[20] and other factors such as structural additions and warranty provisions[21] can make the choice to relocate a manufactured home economically unsound or otherwise out of financial reach for homeowners.[22]

---

[13] RHP Properties, "About Us," accessed May 4, 2020, available at: https://www.rhp-properties.com/about.html.

[14] IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019, at p. 21.

[15] RHP Properties, "Corporate Profile," accessed May 4, 2020, available at: http://www.rhpproperties.com/corporate-profile.asp.

[16] IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019, at p. 23.

[17] IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019, at pp. 23-24. Profit margin calculated as $285 million / $512 million = 56%.

[18] Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015, at p. 3.

[19] Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015, at p. 3.

[20] Forbes, "7 Powerful Benefits To Mobile Home Park Investing," July 11, 2017, accessed May 4, 2020, available at https://www.forbes.com/sites/brandonturner/2017/07/11/7-powerful-benefits-to-mobile-home-park-investing/#2175a6286e92. ("[I]t can cost a tenant $5,000-$7,000 to move their home out of a park and thus 98% of mobile homes will remain in the same location after the second year. 75% of owners expect to stay in their Mobile Homes for 5 years or longer, and a large percentage expect to never sell.")

[21] Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015, at p. 3.

[22] Approximately 25% of manufactured home owners live below the poverty line (*see* Table 1) and are thus often not in a position to bear the upfront costs of moving a manufactured home.

13.  Manufactured homes and the demographics of those who live in them tend to differ from other housing types along a number of dimensions. Table 1 below reports summary demographic statistics for manufactured homes compared to other housing types. For example, on average, manufactured homes are more likely to house low-income families or people with disabilities than are some other types of housing.

**Table 1: Housing and Demographic Characteristics by Housing Type**

| Category | Manufactured Home | Multi-Family Home | Single-Family Home |
|---|---|---|---|
| Average time in current home | 11 yrs | 6 yrs | 14 yrs |
| Average age of home owner | 54 yrs | 48 yrs | 53 yrs |
| Average age of home | 33 yrs | 48 yrs | 47 yrs |
| Median household income | $30,000 | $30,000 | $62,800 |
| Median home market value | $27,534 | $181,245 | $203,652 |
| Median total housing cost | $588 | $880 | $1,130 |
| Homeowner owns associated lot | 41% | n/a | n/a |
| Median monthly rent for lot (if rent is paid) | $377 | n/a | n/a |
| Residents below poverty line | 25% | 29% | 13% |
| Households with veteran or active military duty personnel | 17% | 9% | 17% |
| Households with disabled person in unit | 35% | 26% | 22% |

Sources & Notes:
U.S. Census Bureau, "AHS 2015 National Public Use File (PUF)," accessed April 22, 2020, available at: https://www.census.gov/programs-surveys/ahs/data/2015/ahs-2015-public-use-file--puf-/ahs-2015-national-public-use-file--puf-.html. Calculations exclude observations for which data is not available or for which dollar values are negative. A small number of single-family homes list costs for lot rent in the data, but are not reported here.

14.  Manufactured homes also tend to cost substantially less than other structural types of homes (often referred to as "stick-built homes"). Indeed, the median market value of a single-family home or a unit within a multi-family home is about seven times that of a manufactured home.[23] This is so for several reasons. First, manufactured home construction is centralized in a large manufacturing facility, which allows builders of manufactured homes to take advantage of economies of scale that cannot be achieved when building homes in geographically diffuse worksites.[24] Second, stick-built homes

---

[23]  *See* Table 1, "Median home market value".

[24]  Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015, at p. 4.

6

are typically sold in conjunction with a parcel of land, whereas a manufactured home is often sold separate from the land on which it sits.[25]

15.   The disassociation of the value of land from the cost of buying a home makes manufactured homes more affordable than other housing types. This is because land value can make up as much as 65% of the value of traditional single-family homes.[26] The value of land often makes such homes financially out of reach for many home buyers, who instead purchase manufactured homes affixed to land owned by a third party. Indeed, only about 41% of manufactured home owners own the land under their homes.[27]

16.   A MHC is a centrally managed collection of individually leased manufactured home sites in conjunction with other shared community amenities.[28] While some MHCs are owned by their residents, the more typical arrangement is that the land and facilities (aside from the actual homes) are owned by a third party to whom home owners pay rent (national median rent is about $377 per month)[29] for usage rights.[30] Some MHCs are owned and operated by an individual or small enterprise, while others are owned and/or operated by large, specialized organizations - the three largest of which (including the Defendant RHP) represent about 26% of the market.[31]

---

[25]   NewHomeSource, "The Guide to Manufactured Homes," April 20, 2020, accessed May 4, 2020, available at: https://www.newhomesource.com/learn/newhomesource-guide-to-manufactured-homes/, ("Before buying a manufactured home, homeowners need to have land and a foundation to put their new house on, as the manufacturers do not sell the house with the land.").

[26]   See "Panel State" tab of data available at American Enterprise Institute, "Land Price and Land Share Indicators," accessed May 5, 2020, available at: https://www.aei.org/housing/land-price-indicators/.

[27]   *See* Table 1.

[28]   MHI (Manufactured Home Institute), "Benefits of Living in a Manufactured Housing Community," accessed May 4, 2020, available at: https://www.manufacturedhousing.org/manufactured-housing-community/.

[29]   *See* Table 1, "Median monthly rent for lot (if rent is paid)."

[30]   Freddie Mac Multifamily, "Spotlight on Underserved Markets: Manufactured Housing Resident-Owned Communities," accessed May 5, 2020, available at: https://mf.freddiemac.com/docs/dts_mhroc_report.pdf. ("Out of the approximately 45,600 [Manufactured Housing Communities] in the United States, we found that only 1,065, or 2.4%, are resident-owned.")

[31]   IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019, at p. 21.

7

17.  The "dual-ownership" arrangement (with one party owning the land and another party owning the structure on the land) is economically distinct from other types of home ownership.[32] Such an arrangement often results in a balance of bargaining power that is significantly skewed towards land (MHC) owners, to the disadvantage of homeowners.[33] This is because in many cases manufactured home owners (who are often economically disadvantaged to begin with)[34] have invested a substantial portion of their net worth into a structure that 1) is affixed to land to which they do not have long-term property rights;[35] 2) is costly to relocate;[36] and 3) can be difficult to sell.[37] That is, owners of manufactured

---

[32]  Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015, at pp. 6-7.

[33]  AARP Public Policy Institute, "Manufactured Housing Community Tenants: Shifting the Balance of Power," published 2004, accessed May 6, 2020, available at: https://assets.aarp.org/rgcenter/consume/d18138_housing.pdf, at pp. 1, 3-5. ("[T]he cost and risk of moving a manufactured home from one rental community to another create significant barriers to owners who need or want to move. These barriers make it possible for a segment of community operators to adopt exploitive rules and practices that are unique to this type of housing arrangement.")

[34]  Approximately 25% of residents in MHCs live below the poverty line. *See* Table 1.

[35]  Typically in Massachusetts, manufactured home owners should be offered five-year occupancy agreements with the MHCs. *See* Code of Massachusetts Regulations, 940 CMR 10.03, Terms and Conditions of Occupancy, at ¶5. ("[T]he written disclosure required by 940 CMR 10.03(4) shall contain a *bona fide*, good faith offer to enter into an occupancy agreement with a term of five years at fair market rental rates.") I have also been advised that many residents have an "at-will" arrangement with the MHC in which they reside.

[36]  Forbes, "7 Powerful Benefits To Mobile Home Park Investing," July 11, 2017, accessed May 4, 2020, available at https://www.forbes.com/sites/brandonturner/2017/07/11/7-powerful-benefits-to-mobile-home-park-investing/#2175a6286e92. ("[I]t can cost a tenant $5,000-$7,000 to move their home out of a park and thus 98% of mobile homes will remain in the same location after the second year. 75% of owners expect to stay in their Mobile Homes for 5 years or longer, and a large percentage expect to never sell.")

[37]  Some of the difficulty in reselling manufactured home is related to the expense of moving the home. *See* Will Van Vactor, "Is Buying a Mobile Home a Good Investment?" Nolo, accessed May 7, 2020, available at: https://www.nolo.com/legal-encyclopedia/is-buying-mobile-home-good-investment.html. ("Another unique issue mobile home owners face is reselling the home. Despite what the name implies, 'mobile' homes are not that mobile. Once placed in a mobile home park and hooked up to utilities, mobile homes are not easy to move. In fact, mobile homes can cost thousands of dollars to move. This can make them difficult to resell, since a buyer may have to commit to living in the same mobile home park you live in.") Another factor contributing to the difficulty of reselling a manufactured home may be the limited financing options available to consumers purchasing a manufactured home on leased land. *See* Consumer Financial Protection Bureau, "Manufactured-housing consumer finance in the United States," September 2014, accessed May 7, 2020, available at: https://files.consumerfinance.gov/f/201409_cfpb_report_manufactured-housing.pdf. ("[M]anufactured homes in land-lease communities—about 30 percent of all manufactured housing placements in recent years—are generally only eligible for chattel financing… To begin with, chattel loans may be priced between 50 and 500 basis points higher, all else equal, than a comparable mortgage loan for a manufactured home…Furthermore, there are specific consumer protection laws that apply only to

homes in a MHC would face substantial upfront costs and other challenges if they opted to leave the community, effectively locking-in many residents.

18. This lock-in issue, which is well recognized by MHC operators,[38] often influences the behavior of operators, allowing them to increase rents, while scaling back expenditures on services and amenities.[39] Such bargaining power over residents typically results in high profit margins for MHC owners. Indeed, the average profit margin for a MHC owner is 46.4%.[40] Such high profit margins have garnered the discerning attention of private equity investors who have purchased large stakes in MHC enterprises.[41]

### C.    HOME OIL HEATING SYSTEMS

19. I understand that HOHSs are the primary heating systems used by most CCMHC residents. A HOHS is a system for heating residential structures using oil.[42] The system burns oil to generate heat and then conveys that heat to living areas using either air that is forced through a ventilation system or water that flows through a system of radiators.[43] HOHSs typically rely on an on-site supply of oil maintained in an oil storage tank. These

---

mortgage financing, including parts of the Real Estate Settlement Procedures Act (RESPA) and various state foreclosure and repossession laws.")

[38] Frank Rolfe, founder of Mobile Home University has stated that a MHC "is like a Waffle House where the customers are chained to their booths." *See* The Washington Post, "A billion-dollar empire made of mobile homes," February 14, 2019, accessed May 4, 2020, available at https://www.washingtonpost.com/business/economy/a-billion-dollar-empire-made-of-mobile-homes/2019/02/14/ac687342-2b0b-11e9-b2fc-721718903bfc_story.html.

[39] AARP Public Policy Institute, "Manufactured Housing Community Tenants: Shifting the Balance of Power," published 2004, accessed May 6, 2020, available at: https://assets.aarp.org/rgcenter/consume/d18138_housing.pdf, at pp. 1, 3-5. ("[T]he cost and risk of moving a manufactured home from one rental community to another create significant barriers to owners who need or want to move. These barriers make it possible for a segment of community operators to adopt exploitive rules and practices that are unique to this type of housing arrangement.")

[40] Profit margin is defined as earnings before interest and taxes. *See* IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019, at p. 17.

[41] Private Equity Stakeholder Project, "Private Equity Giants Converge on Manufactured Homes," February 14, 2019, accessed May 4, 2020, available at: https://pestakeholder.org/report/private-equity-giants-converge-on-manufactured-homes/.

[42] I am not a technical expert with respect to home heating systems. The discussion in this section represents my understanding of HOHSs from a lay perspective and should not be taken as a technical expert opinion with respect to HOHS operations or proper maintenance.

[43] Petro Home Services, "How your oil home heating system works," accessed May 4, 2020, available at https://www.petro.com/resource-center/how-your-oil-fired-heating-system-works.

tanks can be indoors, outdoors, above ground, or underground.[44] I understand that CCMHC home sites primarily have above ground, outdoor storage tanks. From the oil storage tank, oil is conveyed to a furnace using electrical and mechanical systems, where it is ignited, producing heat.

20.   I understand that HOHSs require regular maintenance to ensure safe and clean operation and to prevent malfunction.[45] I also understand that, in Massachusetts, MHC operators are responsible for maintenance on the external components of HOHSs, which in the case of CCMHC, primarily consists of oil storage tanks. According to the Defendants, maintenance on the oil storage tanks associated with CCMHC home sites should occur at least annually.[46]

## IV.   PUTATIVE CLASS MEMBERS SUFFERED ECONOMIC INJURY AS A RESULT OF THE DEFENDANTS' FAILURE TO MAINTAIN EXTERNAL COMPONENTS OF HOME OIL HEATING SYSTEMS

21.   As discussed in Section II, Counsel has asked for my opinion as to whether Plaintiffs have suffered economic injury as a result of the Defendants' failure to provide the required HOHS maintenance service. In forming my opinion, I have considered three factors relevant to economic injury in the context of this case:

   a.   Did Plaintiffs pay for HOHS maintenance service?

   b.   Does such service have economic value?

   c.   Did Plaintiffs receive the service?

---

[44]   Griffith Energy Services, Inc., "Oil Storage Tanks: Homeowners Have Different Types and Installation Options," December 17, 2014, accessed May 4, 2020, available at https://www.griffithenergyservices.com/articles/oil-storage-tanks.

[45]   *See* Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. iv, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e29-2876-7299-5f7d-edd84589c5f1&forceDialog=0. *See also* Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, Attachments A & B, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Guide.pdf.

[46]   Joseph Carbone Deposition, 107:09-108:02, June 1, 2016.

22. In this section, I explain that, to the extent the Defendants were legally required to provide certain HOHS maintenance services, from a market perspective the value of those services was a component of the site rental fees paid by Plaintiffs. Hence, CCMHC residents paid for HOHS maintenance service, which, as previously noted I have been instructed to assume the Defendants did not provide. HOHS maintenance has material economic value. The existence of that value is evident from the robust markets for such services. The mechanism through which the value of HOHS maintenance flows is risk avoidance. Risk avoidance is broadly recognized as having economic value[47] and is the value driver of many goods and services.[48] Therefore, Plaintiffs were overcharged by the Defendants with respect to site rental fees, effectively paying for an economically valuable service that they did not receive. This constitutes injury from an economic perspective.

### A. PUTATIVE CLASS MEMBERS PAID THE DEFENDANTS FOR HOME OIL HEATING SYSTEM MAINTENANCE SERVICES

23. Plaintiffs paid for HOHS maintenance service through their site rental fees. Rental fees, in general, are paid in exchange for a bundle of goods[49] – some offered voluntarily and others legally required.[50] For example, in the case of MHCs, residents pay rent not just for the use of land on which to affix their manufactured home, but also for the use of common areas, infrastructure (*e.g.,* private roadways and utility connections), and other

---

[47] *See, e.g.,* Ted O'Donoghue, Ted, and Jason Somerville, "Modeling Risk Aversion in Economics," *The Journal of Economic Perspectives,* Vol. 32, No. 2 (Spring 2018), pp. 91-114. *See also,* Aswath Damodaran, "Value and Risk: Beyond Betas," *Financial Analysts Journal*, CFA Institute, 2005, at p. 38.

[48] For example, the value of a door lock or alarm service is in the reduced risk of burglary; the value of insurance is in the reduced risk of untimely financial shocks; the value of a seatbelt is in the reduced risk of injury or death.

[49] "Goods" in this context may refer to traditional tangible goods, intangible goods, services, or entitlements.

[50] I have been advised that the Commonwealth of Massachusetts requires MHC owners to provide or maintain certain services without separately charging for those services. *See* Code of Massachusetts Regulations, 940 CMR 10.03, Terms and Conditions of Occupancy, at ¶2. I also understand that CCMHC resident access to certain amenities is explicitly granted through CCMHC's occupancy agreement at no additional charge to residents. *See* "Lease Agreement Between Chelmsford Group, LLC and Kevin Michael Cody," dated September 18, 2013, at Section 9.

community features.[51] However, regardless of whether a feature is included in the bundle voluntarily or as a result of legal obligation, the cost and value of that feature will be a determinant of market prices for site rental fees.[52] A MHC operator must, in sum, at least recover the costs of providing features in order to remain a viable business, even if some or all of those features are offered out of legal obligation.

24.   As previously discussed, I understand that maintenance of external HOHS components is a service that MHCs in Massachusetts are required to provide without charging separate fees for the service. For that reason, the value of HOHS service is a component of the market price for site rental fees. Hence, the cost of providing HOHS maintenance service would have been factored into the site rental fees the Defendants charged members of the Putative Class.

25.   Therefore, in paying site rental fees to the Defendants, Putative Class members were and continue to be charged for HOHS maintenance services. To the extent that these services have economic value (as discussed below) and Plaintiffs have been deprived of them (as I have been instructed to assume), Plaintiffs have been overcharged with respect to site rental fees, which constitutes an injury from an economic perspective.

### B.   HOME OIL HEATING SYSTEM MAINTENANCE SERVICE HAS ECONOMIC VALUE

26.   I understand that regular preventative maintenance is an integral factor in the safety, performance, and longevity of HOHSs. The Air Conditioning Contractors of America Educational Institute ("ACCA-EI"), a trade organization that sets standards and guidelines for the broader heating, ventilation, and air conditioning ("HVAC") repair and

---

[51]   See, for example, the amenities offered by CCMHC. *See* Bayshore Home Sales, "Chelmsford Commons," accessed May 4, 2020, available at https://www.bayshorehomesales.com/communities/ChelmsfordCommons.

[52]   Economic research has demonstrated that the cost and value of features offered with respect to a rental property affect the value of the property and the level of rent charged. See *e.g.,* G. Stacy Sirmans, C.F. Sirmans, and John D. Benjamin, "Determining Apartment Rent: The Value of Amenities, Services, and External Factors," *The Journal of Real Estate Research,* vol. 4(2), at pp. 33-43, accessed May 4, 2020. Note, in some special circumstances (*e.g.,* some types of rent control), the cost of a feature that a property owner is legally compelled to provide may not influence the rental fee *per se*. However, the cost of providing that feature will likely be passed-on to renters via alternate channels, such as a reduction in voluntarily offered services.

maintenance industry, notes that, "Mechanical systems require routine monitoring, adjustments, periodic cleaning, and eventual replacement of components."[53] It also notes that, "Regularly scheduled inspections and maintenance are often required to maintain the original equipment manufacturers (OEM) warranty."[54] The ACCA-EI's published recommendations for the maintenance of residential HVAC systems emphasizes that routine maintenance should be conducted on an annual or semiannual basis.[55] This is consistent with recommendations published by the Massachusetts Department of Environmental Protection ("MDEP"), which highlights the need for annual maintenance.[56] The Defendants have also emphasized that oil storage tanks require at least annual maintenance to avoid malfunction.[57]

27.    The failure to perform such maintenance can be costly. ACCA-EI explains that, "Conducting regularly scheduled inspections, maintenance, and remediation of HVAC systems prolongs equipment efficiency, promotes healthy clean air, supports lower utility costs, guards against unexpected failures, and prolongs equipment life. Occupants and the environment will both benefit."[58] Similarly, MDEP suggests that a failure to conduct

---

[53]    Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. v, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e 29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

[54]    Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. v, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e 29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

[55]    Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. iv, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e 29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

[56]    Massachusetts Department of Environmental Protection, "Fact Sheet - Tips For Maintaining Your Home Heating System: Prevent Heating Oil Leaks and Spills," at p. 1, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Tips%20for%20Maintaining%20Your%20Heating %20System.pdf.

[57]    Joseph Carbone Deposition, 107:09-108:02, June 1, 2016.

[58]    Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, at p. v, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e 29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

regular maintenance on HOHS can result in substantial costs.[59] The Defendants "guarantee" that without proper annual maintenance every oil storage tank "goes eventually" and have noted costs in excess of $30,000 for one such incident involving a Plaintiff's leased home site.[60]

### 1. The Value Underlying Home Oil Heating System Maintenance Service is Risk Avoidance, which is Well-Recognized by Economists to Have Tangible Value

28. From an economic prospective, the value of HOHS maintenance flows through the decreased likelihood of the tank having a costly (and potentially catastrophic) malfunction in the future. Such malfunctions may result in a variety of costs. For example, a leak may render a heating system inoperable such that heating oil cannot be delivered.[61] A heating outage during the cold season in Massachusetts may render a home uninhabitable, thus forcing residents to seek alternative shelter.[62] Similarly, a substantial leak may cause environmental damage and the potential for negative health effects, also

---

[59] Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, Attachments A & B, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Guide.pdf.

[60] Joseph Carbone Deposition, 55:17-56:06 & 107:09-108:02, June 1, 2016.

[61] Lionel Marchand Deposition, 34:20-36:05, March 30, 2016.

[62] *See* Code of Massachusetts Regulations, 105 CMR: Department of Public Health, Minimum Standards of Fitness for Human Habitation (State Sanitary Code, Chapter II), at ¶¶410.200-410.201. ("The owner shall provide heat in every habitable room and every room containing a toilet, shower, or bathtub to at least 68°F (20° C) between 7:00 A.M. and 11:00 P.M. and at least 64°F (17° C) between 11:01 P.M. and 6:59 A.M. every day other than during the period from June 15th to September 15th, both inclusive, in each year except and to the extent the occupant is required to provide the fuel under a written letting agreement.")

14

forcing residents to seek alternative shelter and to lose valuable heating oil.[63] Additionally, malfunctions may result in repair and environmental remediation costs.[64]

29. Many of the costs associated with lapsed HOHS maintenance can be substantial and especially burdensome to residents that may have tight financial constraints. For example, temporary lodging may cost $90 per day.[65] A full tank of lost heating oil may cost as much as $1,100.[66] Oil tank replacements can cost between $800 and $3,800.[67] Remediation costs for a ground oil spill in Massachusetts range from $20,000 and $50,000, and increase to an average of $90,000 if the spill reaches ground water.[68]

30. Avoiding the risk of these costly outcomes (which may not occur until some time after the lapsed maintenance) is the value implicit in HOHS maintenance and it is the reason

---

[63] Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, at p. 2, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Guide.pdf. ("…limit your own and your family's potential exposure to the heating oil and its vapors. High concentrations of oil vapors can cause a number of short- and long-term health effects… exposure to heating oil can cause some short- or long-term health effects if the volume or concentration of heating oil is great enough. Common symptoms associated with acute (short-term) exposure to heating oil are: eye irritation, headache, nausea, dizziness, drowsiness, euphoria, loss of coordination and disorientation.")

[64] Although, I understand MHC operators may be responsible for such repair and remediation costs, I also understand that certain capital expenditures undertaken by MHC operators may be passed through to residents through periodic rent increases.

[65] The cost for temporary lodging can be estimated using local hotel prices. According to hotelplanner.com, there are 11 hotels within 5 miles of Chelmsford, MA as of April 10, 2020. These hotels cost between $60 and $119.99 per night, and on average cost approximately $90 per night. *See* Hotel Planner, "Chelmsford Massachusetts Accommodations," accessed May 4, 2020, available at: https://www.hotelplanner.com/Hotels/5692-in-Chelmsford-MA.html#dir-bar.

[66] The average size of a residential oil tank is 275 gallons. *See* Shipley Energy, "How Long Should Heating Oil Last, and How Much Will I Use?" accessed May 4, 2020, available at: https://www.shipleyenergy.com/energy-101-guides/guide/2019/10/21/how-long-should-heating-oil-last-and-how-much-will-i-use. In the last 10 years, heating oil prices in Massachusetts peaked at $3.97 per gallon in the 2012/13 season. *See* Massachusetts Department of Energy Resources, "Massachusetts Retail Heating Oil Prices," accessed May 4, 2020, available at: https://www.mass.gov/service-details/massachusetts-retail-heating-oil-prices. Hence, a full tank of lost heating oil can cost up to approximately $1,100 (275 gallons x $3.97/gallon = $1,091.75).

[67] Angie's List, "How Much Does Oil Tank Replacement Cost?" March 2, 2018, accessed May 4, 2020, available at: https://www.angieslist.com/articles/how-much-does-oil-tank-replacement-cost.htm.

[68] Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, at p. i, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Guide.pdf.

15

why many consumers are willing to pay significant costs for such maintenance service (as discussed further below). From an economic perspective, risk (or the avoidance of risk) has real and quantifiable value.[69] For example, the value of risk-avoidance is routinely and systematically quantified by mortgage lenders. Default risk (along with other market factors) determines the mortgage rate a homebuyer must pay, and that rate in turn determines the real cost of the purchased property. A mortgage lender uses a borrower's credit score as a measure of the borrower's default risk. The lower the borrower's credit score, the higher their default risk and the higher the cost of the mortgage. For example, on a 30-year $200,000 mortgage, a borrower with a credit score ranging from 620 to 639 (equating to a roughly 15.2% probability of default) is expected to pay an additional $185 per month on the same mortgage when compared to a borrower who has a credit score above 720 (a roughly 0.4% chance of default).[70] Over the life of the loan, the borrower with the higher default risk is expected to pay $66,754 more in interest than the borrower with the lower default risk.[71] In this example, the difference of $66,754 is the market value of the additional risk involved with lending to the first borrower.

31. The value of risk is not only apparent in sophisticated centralized markets, but also plays a meaningful role in decentralized markets that involve relatively unsophisticated agents. An illustrative example of this is the used automobile market. Because the cost of

---

[69] *See, e.g.,* Ted O'Donoghue, and Jason Somerville, "Modeling Risk Aversion in Economics," *The Journal of Economic Perspectives,* Vol. 32, No. 2 (Spring 2018), pp. 91-114. ("Economists have a shared preconception that, for the most part, people dislike risk. We typically assume that a person who is offered a choice between a risky lottery versus a sure payment equal to the expected value of that lottery will choose the latter. Similarly, when a person compares two lotteries with equal expected values, we assume that the person will choose the lottery with less risk.... Risk aversion plays a central role in financial investment, driving the key trade-off between risk and return in the pricing of financial assets.") *See also,* Aswath Damodaran, "Value and Risk: Beyond Betas," *Financial Analysts Journal,* CFA Institute, 2005, at p. 38.

[70] *See* Bankrate, "How your credit score affects your mortgage rate," November 22, 2019, accessed May 4, 2020, available at: https://www.bankrate.com/mortgages/how-your-credit-score-affects-your-mortgage-rate/. *See also* Paynet, "Achieving Greater Predictive Power: Credit Scoring versus Probability of Default," accessed May 8, 2020, available at: https://paynet.com/media/1207/credit-scoring-vs-probability-of-default.pdf. Default rates are estimated using 2011 numbers from the "Default Rates by Credit Quality Tier" table.

[71] Bankrate, "How your credit score affects your mortgage rate," November 22, 2019, accessed May 4, 2020, available at: https://www.bankrate.com/mortgages/how-your-credit-score-affects-your-mortgage-rate/.

unexpected auto repairs can be a substantial burden for many used car buyers, such buyers often undertake efforts to understand the risk of malfunction and the associated costs. For example, many used car buyers inspect the maintenance records of an automobile before purchasing it. The contents of those records likely affects the price the buyer is willing to pay for the car. A car with well-established maintenance records can likely command a higher price compared to a car with poor or no maintenance records, even if the two are otherwise functionally and observationally equivalent in the present.[72] This is because the buyer understands that the vehicle that has not been well-maintained has a greater risk of costly malfunction after purchase compared to a vehicle that has undergone regular maintenance. Hence, the value of the used car is diminished by the lack of documented maintenance because it has a higher risk of future malfunction.

32.  The case of deficient maintenance on HOHSs is similar to the case of deficient maintenance of an automobile. Failure to maintain a HOHS results in increased risk of malfunction over time – a risk borne largely by the residents who rely on the system for heat.[73] The avoidance of that risk has tangible value as evident through the robust market for maintenance services[74] and by the significant market price many consumers are willing to pay to mitigate the risk, as discussed below. If these valuable HOHS maintenance services were not included in the bundle of services for which MHC residents in Massachusetts pay site rental fees, the market price for site rental fees would

---

[72]  Carfax, "Check the Service History of a Car," accessed May 4, 2020, available at: https://www.carfax.eu/article/car-service-history. ("One of the greatest benefits of buying a vehicle which includes with [it] the service history, is the peace of mind it brings with it. Owners who took the time, and spent the money, to regularly maintain their vehicle often tend to have taken better care of the vehicle in general.")

[73]  Note that some of the costs that result from poor maintenance may initially fall on the shoulders of the Defendants. However, I understand that MHC operators are permitted to pass capitalized expenses on to residents. Therefore, much of the cost and risk that is initially borne by the Defendants will likely be remitted to CCMHC residents. The amount that gets passed through to residents will depend on the demand characteristics of the market. In particular it will depend on the sensitivity of consumers to changes in site rental fees. As I have discussed in Section III, current residents will find it difficult to move out of CCMHC even in the face of increased fees. For that reason, residents may be insensitive to site rental fee increases, which will allow the Defendants to pass a large portion of costs through to residents. A measure of the typical pass-through rate can be obtained through an examination of the Defendants' financial records with respect to CCMHC.

[74]  HVAC maintenance and repair services account for about 32.5% of the broader $93.3 HVAC industry. IBISWorld, "IBISWorld Industry Report 23822a Heating & Air Conditioning Contractors in the US," December 2019, at p. 4.

17

be lower. Because Plaintiffs paid fees based on a market rate that reflects the inclusion of HOHS maintenance services that were ultimately not provided, Plaintiffs were overcharged.

### 2. The Value of Home Oil Heating System Maintenance Service is Evident from the Robust Markets for Those Services

33. Maintenance service agreements for home heating systems are a commonly offered product in Massachusetts.[75] Maintenance service agreements (or maintenance programs) are offered by many oil delivery and HVAC repair services and provide for a technician to perform standard maintenance on a home heating system for a pre-paid, fixed cost.[76] For example, Falite Bros., Inc., an HVAC company based out of the Greater Boston Area, offers Heating Only maintenance plans for $199 per year.[77] Winters Home Services, another HVAC company based out of the Greater Boston Area, offers broader maintenance plans for $544 per year.[78] Direct Energy (one of the largest energy retail providers offering services in Massachusetts)[79] offers heating maintenance plans ranging

---

[75] A review of HVAC repair providers in Massachusetts that advertise on the Internet demonstrates that many offer some form of prepaid service agreement. See, *e.g.,* Rodenhiser, "Service Plans," accessed May 5, 2020, available at: https://www.rodenhiser.com/maintenance-plans.html; Meacham Companies, "One Hour HVAC Maintenance Program," accessed May 5, 2020, available at: https://www.markemeacham.com/hvac/hvac-maintenance-program.html; Preferred Air, "Preferred Maintenance Contracts – Peace of Mind & Savings," accessed May 5, 2020, available at: https://preferredair.com/service-contracts/.

[76] Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," ACCA Standard 4, at p. 53, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

[77] Falite Bros., Inc.'s heating maintenance plan consists of one visit per year. *See* Falite Bros., Inc., "Wakefield Residential HVAC Maintenance Plans," accessed May 4, 2020, available at: https://www.falitebros.com/residential-hvac/residential-maintenance-plans/.

[78] Winter Home Services' maintenance plan consists of two visits per year for both heating and cooling. Therefore the price for Heating only can be estimated to be around half of $544 (~$272). *See* Winters Home Services, "Heating and Cooling 1, 3, & 5 Year Maintenance Program in Boston," accessed May 4, 2020, available at: https://www.wintershomeservices.com/maintenance-plans/heating-cooling-maintenance-program/#~R7T3F52.

[79] Direct Energy, "Our Footprint and History," accessed May 7, 2020, available at: https://www.directenergy.com/about/about-direct-energy/history. *See also* Direct Energy, "Home Heating Protection Plans," accessed May 7, 2020, available at: https://www.directenergyprotects.com/protection-plans/heating.

18

from \$11.99 per month (\$143.88 per year) to \$24.99 per month (\$299.88 per year) depending on the breadth of services requested.[80]

34.   Similarly, a number of service providers also offer oil tank insurance in order to minimize the financial shock that may result from oil tank malfunction. For example, the Powderhorn Agency[81] offers oil tank insurance policies specifically aimed at MHCs.[82] The policies cost about \$120 per residence, per year, and offer coverage for up to \$50,000 in environmental cleanup and a \$1,500 allowance for replacement tanks.[83] While insurance is not necessarily a direct measure of the value of maintenance, the existence of a market for these types of policies is further evidence that avoiding some of the risks associated with oil tank malfunction has tangible economic value.

## V.   DAMAGES CAN BE RELIABLY ESTIMATED USING WELL-ESTABLISHED ECONOMIC PRINCIPLES COMBINED WITH INFORMATION THAT IS OR WILL LIKELY BECOME AVAILABLE

35.   Counsel has asked my opinion as to whether the damages incurred, if any, can be readily and reliably estimated with information that is available or may become available during discovery.

36.   As discussed above, in paying rents to CCMHC, Plaintiffs purchased a bundle of goods. That bundle includes grounds maintenance, infrastructure use and maintenance, and use of common areas, among other things. Importantly, the bundle of goods purchased by Plaintiffs through their site rental fees also includes, at a minimum, the level of services and entitlements required under the law. One such service is the maintenance of external

---

[80]   Direct Energy, "Home Heating Protection Plans," accessed May 7, 2020, available at: https://www.directenergyprotects.com/protection-plans/heating.

[81]   The Powderhorn Agency is Connecticut-based manager of residential warranty and protection programs and is part of a "national partnership of leading independent property and casualty and employee benefits brokerage firms." *See* Powderhorn Agency, "About Us," accessed May 7, 2020, available at: https://powderhornagency.com/about-us/.

[82]   Powderhorn Agency, "Pennsylvania Manufactured Housing Association," April 1, 2014, accessed May 4, 2020, available at: https://powderhornagency.com/blog/pennsylvania-manufactured-housing-association/.

[83]   The PowderHorn Agency reports the cost of its policy as "around \$10 per month per unit." *See* Powderhorn Agency, "Pennsylvania Manufactured Housing Association," April 1, 2014, accessed May 4, 2020, available at: https://powderhornagency.com/blog/pennsylvania-manufactured-housing-association/.

components of HOHSs. Because Plaintiffs did not receive this service, which they paid for and, as demonstrated above, has economic value, Plaintiffs have suffered an economic injury.

37. The economic damages related to that injury can be thought of in terms of the amount by which Plaintiffs were overcharged for site rental fees. That overcharge can be estimated as the market value for the services residents should have, but did not, receive. That is, the amount of the overcharge can be related to the price that would arise in an unencumbered market for the deficient service, if such a market existed. To the extent that a market aimed at the particular HOHS maintenance services at issue in this matter does not exist, the price that would arise in that market can be estimated through several methods.[84]

38. The first method is to observe prices for similar benchmark services in existing markets. As discussed in the previous section, pre-paid or fixed-price HOHS maintenance contracts are common in New England. The prices for some such services are publicly available.[85] Notably, I have observed that the cost of HOHS maintenance contracts primarily range from about $100 to about $500 per year, per-residence depending on, among other factors, the breadth and frequency of services offered.[86] Extrapolating that

---

[84] Note that the methods ultimately employed will depend on the information that becomes available through discovery.

[85] *See* Falite Bros., Inc., "Wakefield Residential HVAC Maintenance Plans," accessed May 4, 2020, available at: https://www.falitebros.com/residential-hvac/residential-maintenance-plans/. *See also* Angie's List, "HVAC Maintenance," accessed May 4, 2020, available at: https://www.angieslist.com/research/hvac-maintenance/. ("[HVAC service contracts] cost between $150 and $500 per year, but they often include yearly inspections of both your furnace and A/C, discounts on major repairs, and preferred scheduling status when you have problems during the busy season.")

[86] *See, e.g.* Angie's List, "HVAC Maintenance," accessed May 4, 2020, available at: https://www.angieslist.com/research/hvac-maintenance/. ("[HVAC service contracts] cost between $150 and $500 per year, but they often include yearly inspections of both your furnace and A/C, discounts on major repairs, and preferred scheduling status when you have problems during the busy season.") *See also* FIIIXR, "Annual Air Conditioner Maintenance Cost," accessed May 5, 2020, available at: https://www.fixr.com/costs/annual-air-conditioner-maintenance. ("Such contracts cost anywhere from $100-$150 per year, and cover annual visits in which standard maintenance tasks are performed.")

range to 255 residences (the approximate number of home sites at CCMHC)[87] over a 78 month timeframe (the duration of the Damages Period)[88] HOHS maintenance service contracts would range, in aggregate, from about \$165,750 to \$828,750.[89] In order to relate these benchmark costs to the economic harm suffered by Plaintiffs, I would conduct an analysis of the available data to determine the extent to which adjustments might be appropriate to account for differences in benchmark service contracts and the particular services at issue in this matter. For example, there may be differences in such things as the scope of service plan coverage offered in benchmark agreements as compared with the particular set of services at issue in this matter. Additional adjustments may be necessary based on the number of Putative Class members and the timeframe over which they relied on HOHSs as residents of CCMHC.

39.   A second method for estimating the market value of the services in question is to analyze the additional costs that CCMHC would have incurred if it had properly maintained external HOHS components. This is relevant because the costs of providing a service must be less than the price consumers would be willing to pay for the service in an unencumbered market.[90] Therefore, the costs the Defendants would have had to pay to provide the expected services is a lower bound estimate of the market value of such services.

40.   In order to calculate the costs that the Defendants would have incurred related to maintaining external HOHS components I would rely on a subject matter expert or other authoritative sources to understand the nature, cost, and frequency of activities typically

---

[87]   RHP Properties, Chelmsford Commons Sitemap, accessed May 7, 2020, available at: https://public.rhp-properties.com/newbury/site_maps/sitemap_Chelmsford_Commons.pdf.

[88]   The timeframe in question is April 2011 to November 2017. *See* Notice of Removal, *Rosa Layes v. RHP Properties Inc.,* No. 1:20-cv-10721-RWZ, April 13, 2020, at ¶35.

[89]   Note, this is based on the cost of 255 individual maintenance contracts, reflecting value in the consumer market, which is consistent with value perspective of Putative Class members. The calculation for the lower bound of the range is: \$100 x 255 residences x 6.5 years = \$165,750. The calculation for the upper bound of the range is \$500 x 255 residences x 6.5 years = \$828,750.

[90]   This is true because, in an unencumbered market (*i.e.,* a well-functioning market free from substantial market failures), a service will not be offered unless the price that consumers are willing to pay exceeds the cost of providing the service. Otherwise, the service provider would be willfully selling the service at a loss, which is not a rational business decision.

associated with regular maintenance of such services. For example, ACCA-EI publishes HOHS maintenance guidelines and checklists.[91] Similarly, MDEP publishes a list of recommendations for regular maintenance.[92] Additionally, the Defendants assert that oil tanks need to at least be emptied, cleaned, and de-rusted every year.[93] If, for instance, these maintenance tasks would have required the Defendants to employ one full-time HVAC technician,[94] the employment cost incurred by CCMHC would be about $113,493 per year,[95] or about $737,705 over the six and a half year period in question.[96] This is in addition to the costs for necessary parts and materials. In this (illustrative) example, total damages would be at least $737,705.

---

[91] Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4*, accessed May 4, 2020, available at https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

[92] Massachusetts Department of Environmental Protection, "Fact Sheet - Tips For Maintaining Your Home Heating System: Prevent Heating Oil Leaks and Spills," accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Tips%20for%20Maintaining%20Your%20Heating%20System.pdf.

[93] Joseph Carbone Deposition, 107:09-108:02, June 1, 2016.

[94] This is an illustrative example of how one could calculate the costs that CCMHC would have incurred; it does not necessarily represent my opinion with respect to how many or what type of professionals CCMHC would have employed in order to fulfill its maintenance requirements.

[95] The average HVAC technician in Chelmsford Massachusetts earns about $79,445 per year. *See* Paysa, "HVAC Technician Salaries in Chelmsford, MA," last updated May 2, 2018, accessed May 4, 2020, available at: https://www.paysa.com/salaries/hvac-technician--chelmsford,-ma--tl. This is consistent with the statewide average of $81,682. *See* Housecall Pro, "How Much Does An HVAC Technician Make In Every State: Updated For 2020," December 3, 2019, accessed May 4, 2020, available at: https://www.housecallpro.com/learn/hvac-tech-salary/. This is also consistent with US Bureau of Labor Statistics ("BLS"), which reports annual base wages of $63,510, excluding overtime and discretionary pay. *See* U.S. Bureau of Labor Statistics, "May 2019 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates: Boston-Cambridge-Nashua, MA-NH," accessed May 11, 2020, available at: https://www.bls.gov/oes/current/oes_71650.htm, at Occupation Code 49-9021. As also reported by the BLS, employee salaries and wages comprises about 70% of the total cost of employment incurred by employers. *See* U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation Summary," March 19, 2020, accessed May 4, 2020, available at: https://www.bls.gov/news.release/ecec.nr0.htm. Hence, the average annual cost of employing one full-time HVAC technician in Chelmsford Massachusetts is about $113,493 ($79,445/70% = $113,493).

[96] $737,705 = $113,493 x 6.5 years. This calculation is in real terms, assuming that inflation is equal to average annual wage growth.

## VI.    DAMAGES CAN BE CALCULATED BASED ON EVIDENCE COMMON TO ALL PUTATIVE CLASS MEMBERS

41.    Damages can be calculated based on evidence that is common to all members of the Putative Class. That is because all Putative Class members would be entitled to the market value of the deficient services. This is true from an economic perspective even if individual Putative Class members may have valued the service more or less than the market value for those services. Indeed, given an unencumbered market, the rightful owner (or recipient) of a good or service can freely buy and sell that same good or service at the prevailing market price. If the owner personally valued it less than the market price, she could have sold it and still received the full market value of the good or service. Therefore, in being deprived of the good or service to which she is entitled, she has been deprived of an amount equal to the market value. If, alternatively, the owner valued the good or service to which she is entitled more than the market price, then when deprived of that good or service she could, in principle, buy a replacement. To the extent replacing the good or service is in fact feasible, this would limit the harm to the amount of the replacement cost (*i.e.,* the market price). In either case, the value that has been taken from the rightful owner of a good or service in depriving her of it is equal to the market value.

42.    Moreover, "market value" for a given good or service in a given time period is determined by the prevailing market price and does not necessarily vary based on the identity of an individual buyer or seller. Hence, the market value for a given set of HOHS maintenance services in a given time period will be common to all members of the Putative Class.[97]

43.    However, the total amount of damages owed to individual Putative Class members will vary depending on the timeframe in which they paid home site rental fees to the Defendants. Because the services in question are periodic in nature, the value of deficient

---

[97]    It is possible that there may be variation across subsets of individual Putative Class members with respect to the HOHS equipment utilized and that such variation in equipment may result in variations in service costs. For example, it may cost more to service a 500 gallon oil tank than it does to service a 250 gallon oil tank. Although I am not currently aware of evidence to suggest there is broad variation in equipment or applicable service costs, if that were the case, the amount of damages owed to a subset of Putative Class members (subsetting by equipment type) can be determined based on type of equipment relevant to that subset of Putative Class members – a readily observable factor.

23

services depends on the duration over which those services should have been, but were not provided. Therefore, damages will vary by Putative Class members' tenure at CCMHC. Nevertheless, damages allocable to any particular individual in the Putative Class can be calculated by summing the service value in all the relevant months for which the Putative Class member paid home site rental fees.

## VII. CONCLUSIONS

44. In conclusion, it is my opinion that members of the Putative Class suffered a real economic injury insofar as they paid for an economically valuable service that was ultimately not provided to them. For that reason Plaintiffs were overcharged for the site rental fees they paid to the Defendants by an amount related to the value of the deficient services. The value of those services in a given month is common to all members of the Putative Class and can be reliably estimated using standard economic analysis in combination with evidence that is, or will likely become, available.

Dr. Brent Lutes

24

# Appendix A: CV

**BRENT A. LUTES**
Senior Associate

Boston, MA    +1.617.864.7900    Brent.Lutes@brattle.com

**Dr. Brent Lutes is an economist with broad experience consulting for attorneys and companies involved in complex commercial litigation and regulatory proceedings.**

He has extensive experience in intellectual property, commercial damages, and rate regulation matters. Dr. Lutes has consulted on numerous infringement cases involving reasonable royalties and other forms of damages, commercial success, preliminary injunctions, and domestic industry analysis for Section 337 inquiries. Such matters include software applications, major biosimilar and biologic market entry matters, consumer products, copy protected materials, and telecommunications services.

In the context of commercial damages, Dr. Lutes has consulted on issues involving data security and privacy violations, product liability class actions, and contract disputes. In the context of rate regulation, he regularly submits reports to and appears in front of the Federal Communications Commission on matters related to subsidized telecom services.

Dr. Lutes has further industry experience in the pharmaceutical, consumer products, cryptocurrency, medical device, and transportation sectors. While his interests and skills are diverse, they tend to revolve around the practical application of microeconomic analysis to address real-world (and interesting) problems.

Prior to earning his Ph.D., Dr. Lutes was a member of the U.S. Armed Forces.

## EDUCATION

Ph.D. in economics, econometrics, and public choice; University of California, Irvine

M.A. in economics; University of California, Irvine

B.A. in economics; San Diego State University

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2016–Present | **The Brattle Group**<br>Senior Associate |
| 2010–2015 | **University of California, Irvine**<br>Teaching Assistant/Research Assistant |
| 2001–2005 | **U.S. Army**<br>Soldier/Specialist |



## AREAS OF EXPERTISE

- Economic analysis of intellectual property

- Damages analysis

- Empirical economic analysis

- Economics of technology

- Regulated markets

- Life sciences

- Multisided platform economies

## SELECTED TESTIFYING EXPERIENCE

- *In the Matter of Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*
  *Docket No. 03-123*
  Before the Federal Communications Commission. Appeared in front of the Bureau of Consumer and Government Affairs regarding rate regulation, June 2019.

- *In the Matter of Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities; Structure and Practices of the Video Relay Service Program; Misuse of Internet Protocol (IP) Captioned Telephone Service*
  *CG Docket Nos. 13-24, 10-51, and 03-123*
  Before the Federal Communications Commission. Appeared in front of Consumer and Government Affairs regarding economic analysis report, April 2019; submitted an economic analysis report on behalf of a regulated service provider, March 2019; appeared in front of CGB regarding rate methodology, November 2019.

- *In the Matter of Misuse of Internet Protocol (IP) Captioned Telephone Service*
  *CG Docket No. 13-24*
  Before the Federal Communications Commission. Appeared in front of the Interstate Telecommunications Relay Service (iTRS) advisory committee regarding rate regulation, November 2018; submitted an economic analysis report on behalf of a service provider, November 2017; Submitted a report on behalf of a service provider, August 2017.



BRENT A. LUTES

## SELECTED CONSULTING EXPERIENCE

### *Telecom, Tech and Manufacturing*

- Worked on behalf of the plaintiffs in a matter related to patents for certain cable television software applications and DVR features. Prepared expert reports assessing reasonable royalties relating to the alleged infringement by several major telecom providers.

- Worked for a provider of captioned telephone services for people who are deaf or hard of hearing in a series of regulatory proceedings to determine the appropriate reimbursement rate and rate structure for service providers. Assessed the role of royalty rates for integrated software in determining regulated riembursment rates. Authored three reports and appeared in front of the Federal Communications Commission.

- Worked on behalf of musical works rightsholders in a major Copyright Royalty Board ratemaking proceedings (Phonorecords III). Assessed reasonable royalty rates for music distributed through streaming applications by designing and implementing a Shapley value analysis to determine the fair allocation of profits between market participants. Prepared expert testimony and rebutted experts working on behalf of Apple, Google, Microsoft, Spotify, Pandora, and Amazon. Analysis and testimony were cited in the Board's decision to implement the first substantial royalty rate increase in recent history.

- Worked on behalf of the plaintiffs in a matter related to a high-profile breach of healthcare data. Prepared expert reports explaining how to quantify the damages owed to individuals whose personal data was stolen. Pioneered a novel approach to the valuation of privacy by analyzing the extent to which dark web sales of personal data could be used as an objective measure of consumer losses due to breach. Worked on behalf of the plaintiffs in a matter related to a high profile data breach in the hospitality industry. The matter is ongoing.

- Worked on behalf of the plaintiffs in a matter related to a high profile data breach in the medical diagnostic industry. The matter is ongoing.

- Worked on behalf of the plaintiffs in a matter related to a high profile data breach in the financial services industry. The matter is ongoing.

- Worked on behalf of the defendant in a matter related to a data breach and the subsequent theft of cryptocurrency. The matter is ongoing.

- Consulted for a hedge fund in its efforts to divest a telecom service provider. Provided an analysis of the technical, market, and regulatory risks to inform the client's decision-making process.



- Worked on behalf of complainants (Electrolux Home Products, Inc. and KX Technologies, LLC) in an ITC 337 investigation to determine the extent of the complainants' domestic industry for the refrigerator water filters in question. (*In the Matter of Certain Water Filters and Components Thereof*, No. 337-TA-1126)

- Worked on behalf of defendants accused of collusion in the capacitor market. Performed analysis and prepared rebuttal testimony comparing allegedly collusive prices to non-collusive prices.

- Worked on behalf of Chervon, a leading producer of store-brand power tools. Prepared report evaluating the commercial success associated with several patents held by Milwaukee Electric Tool Corporation (Milwaukee). Analyzed reasonable royalty damages that Chervon would have owed Milwaukee, if patents at issue were found to be valid and infringed.

- Worked on behalf of a large law firm accused of malpractice with respect to patent construction. The alleged malpractice resulted in questionable patent ownership and allegedly precluded the plaintiff from certain financial deals.

## *Life Sciences and Pharmaceuticals*

- Worked on behalf of a major pharmaceutical firm bringing a biosimilar drug to market in the US. Despite the expiration of the compound patents, the reference drug manufacturer claimed that the biosimilar infringed on a number of process patents and sought injunctive relief and reasonable royalties in multiple jurisdictions. The matter is ongoing.

- Worked on behalf of a major biologic drug manufacturer in an ITC 337 case. The claimant asserted that the pending U.S. entry of a biosimilar imported from abroad is predicated on a stolen trade secret.

- In an arbitration matter, worked on behalf of the respondent, a foreign producer of biosimilar drugs and other pharmaceuticals. The respondent, which had entered into a venture with the claimant to pursue U.S. business opportunities, was being sued by the claimant for a portion of the alleged value of the venture: the sum of profits arising from three potential biosimilar drug candidates.

- Worked on behalf of the University of Sydney, which had been accused of wrongfully terminating patent licenses granted to ObjectiVision, an Australian start-up producing medical devices for use in screening glaucoma and other eye diseases. Prepared report rebutting damages claims presented by two experts working on behalf of ObjectiVision, as well as joint reports with each expert. The report was used successfully to exclude the opposing experts' testimony.



- Worked on behalf of a major manufacturer of medical devices involved in litigation over infringement of a number of its key patents related to components used in spinal surgery. Provided analysis in support of a preliminary injunction and ultimately calculated reasonable royalties related to the patented components as well as lost sales of related, but non-patented components sold by the patent owner.

- Worked on behalf of a leading manufacturer of store-brand over-the-counter drugs in a tax matter. Evaluated the reasonableness of internal sales forecasts relating to certain generic drugs which were used as a basis for transfer pricing.

### *Payment Systems and Banking*

- Our client, a departed co-founder of a leading cryptocurrency platform was prevented from selling his holdings of the platform's cryptocurrency on third party exchanges (TPEs). Working on his behalf in an arbitration, Brattle prepared several reports demonstrating that this constraint was unduly limiting, given the growing importance of TPEs in the cryptocurrency's ecosystem and the vibrancy of the market for that cryptocurrency.

- Retained by a defendant (a major telecom company) accused of providing inadequate data security, which allegedly resulted in the theft of the plaintiff's cryptocurrency holdings. Performed market analysis in order to value assets in question.

- Consulted for Visa and authored a paper analyzing the competitive dynamics of credit card interchange fees. Demonstrated the nuance of multi-sided platform competition and the potential for regulatory failures.

- Supported banking expert and prepared expert testimony on behalf of the defendant, Merrill Lynch, in addressing bank due diligence, documentation and monitoring responsibilities for commercial loans secured by a brokerage account.

### *Transportation*

- Worked for a defendant accused of stealing trade secrets related to nascent autonomous vehicle technology. Analyzed the value of the relevant trade secrets and rebutted the speculative nature of the plaintiff's damages claims.

- Prepared expert affidavit on behalf of Uber Technologies, which was submitted to the Georgia House Ways and Means Committee on the fiscal impact of a proposed sales tax on for-hire and ride-share trips, March 2017.



- Worked on behalf of a major manufacturer of business jet aircraft accused of monopoly leveraging and attempted monopolization. Conducted an analysis of the structure of the business jet aircraft market, evaluating the extent to which the availability of comparable models from other manufacturers constrained the defendant's ability to exercise market power.

- Worked on behalf of a major U.S. railroad involved in a commercial dispute over trackage rights and trackage fees. Conducted a detailed analysis of over-the-track incremental operating costs. This analysis involved, among other things, extensive use of the Uniform Rail Costing System maintained by the Surface Transportation Board.

- Worked on behalf of the plaintiffs in a class-action lawsuit involving a major manufacturer of commercial trucks. Analyzed the differences in engine repair rates between class and comparable trucks. Provided damages analysis based on the difference in the market price of the trucks before and after the defect became known, based on a model of gradual revelation.

- Worked for the plaintiff, US Airways, to evaluate the competitive dynamics of air travel booking platforms. (*US Airways, Inc. v. Sabre Holdings Corporation, Sabre Inc., Sabre Travel International Limited*)

## RESEARCH AND PUBLICATIONS

- *Economic Considerations of IP CTS Rate Structure and Methodology*, with Coleman Bazelon, March 27, 2019. Available at: https://ecfsapi.fcc.gov/file/10327217925757/IP%20CTS%20Rate%20Structure%20(REDACTED%20-%20FOR%20PUBLIC%20INSPECTION).pdf

- *Regulatory Intervention in Card Payment Systems: An Analysis of Regulatory Goals and Impact*, with Eliana Garces, September 21, 2018. Available at: https://ssrn.com/abstract=3346472

- *Economic Analysis of IP CTS Provision Costs and Rate Setting*, with Coleman Bazelon and Patrick Holder, November 8, 2017. Available at: https://ecfsapi.fcc.gov/file/11102992903338/Hamilton%20ex%20parte%20filing%2011-9-2017.pdf

- *Telecommunications Relay Services for Individuals who are Deaf or Hard of Hearing*, with Coleman Bazelon, August 30, 2017. Available at: https://ecfsapi.fcc.gov/file/1090595544595/Hamilton%20ex%20parte%2008-31-17%20(Brattle%20Group%20white%20paper).pdf



- *The Economic Concerns of Legislative and Regulatory Governance*, Ph.D. dissertation, University of California, Irvine, 2015. Available at: https://search.proquest.com/openview/a2e29655d70e020375979c0a49f50d88/1?pq-origsite=gscholar&cbl=18750&diss=y

- *The Non-Market Competition for Land-Use*, October 25, 2015. Available at: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.710.4786&rep=rep1&type=pdf

## PROFESSIONAL AFFILIATIONS

- American Economic Association

- American Bar Association

- Econometric Society

- Western Economic Association International

## HONORS AND FELLOWSHIPS

2014    Borowski Fellowship (Center for Economics and Public Policy)

2014    Economic Research Fellowship (University of California, Irvine)

2012    Economic Research Fellowship (University of California, Irvine)

2010    Center for Public Economics Award

2010    Weintraub Research Award

2009    Veterans Writing Award

2009    Weintraub Research Award



7

# Appendix B: Materials Relied On

**Court Case**

*Rosa Layes v. RHP Properties, Inc.,* No. 1:20-cv-10721-RWZ (United States District Court, District Court of Massachusetts, March 25, 2020).

**Court Documents**

First Amended Class Action Complaint, *Rosa Layes v. RHP Properties Inc.,* No. 1581CV02722-C, March 25, 2020.

Notice of Removal, *Rosa Layes v. RHP Properties Inc.,* No. 1:20-cv-10721-RWZ, April 13, 2020.

**Produced Documents**

"Lease Agreement Between Chelmsford Group, LLC and Kevin Michael Cody," dated September 18, 2013.

**Depositions**

Joseph Carbone Deposition, June 1, 2016.

Lionel Marchand Deposition, March 30, 2016.

**Academic Papers**

Aswath Damodaran, "Value and Risk: Beyond Betas," Financial Analysts Journal, CFA Institute, 2005.

Charles Becker and Ashley Yea, "The Value of Manufactured Housing Communities: A Dual-Ownership Model," *Economic Research Initiatives at Duke,* October 15, 2015.

G. Stacy Sirmans, C.F. Sirmans and John D. Benjamin, "Determining Apartment Rent: The Value of Amenities, Services, and External Factors," *The Journal of Real Estate Research,* vol. 4(2), at pp. 33-43.

Ted O'Donoghue, and Jason Somerville, "Modeling Risk Aversion in Economics," *The Journal of Economic Perspectives,* Vol. 32, No. 2 (Spring 2018), at pp. 91-114.

**Public Sources**

AARP Public Policy Institute, "Manufactured Housing Community Tenants: Shifting the Balance of Power," published 2004, accessed May 6, 2020, available at: https://assets.aarp.org/rgcenter/consume/d18138_housing.pdf.

Air Conditioning Contractors of America (ACCA), "Maintenance of Residential HVAC Systems," *ACCA Standard 4,* accessed May 4, 2020, available at: https://www.acca.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=6b7b0e29-2876-7299-5f7d-edd84589c5f1&forceDialog=0.

Angie's List, "How Much Does Oil Tank Replacement Cost?" March 2, 2018, accessed May 4, 2020, available at: https://www.angieslist.com/articles/how-much-does-oil-tank-replacement-cost.htm.

Angie's List, "HVAC Maintenance," accessed May 4, 2020, available at: https://www.angieslist.com/research/hvac-maintenance/.

Bankrate, "How your credit score affects your mortgage rate," November 22, 2019, accessed May 4, 2020, available at: https://www.bankrate.com/mortgages/how-your-credit-score-affects-your-mortgage-rate/.

Bayshore Home Sales, "Chelmsford Commons," accessed May 4, 2020, available at: https://www.bayshorehomesales.com/communities/ChelmsfordCommons.

Carfax, "Check the Service History of a Car," accessed May 4, 2020, available at: https://www.carfax.eu/article/car-service-history.

Code of Massachusetts Regulations, 105 CMR: Department of Public Health, Minimum Standards of Fitness for Human Habitation (State Sanitary Code, Chapter II).

Code of Massachusetts Regulations, 940 CMR 10.03, Terms and Conditions of Occupancy.

Consumer Financial Protection Bureau, "Manufactured-housing consumer finance in the United States," September 2014, accessed May 7, 2020, available at: https://files.consumerfinance.gov/f/201409_cfpb_report_manufactured-housing.pdf.

Direct Energy, "Home Heating Protection Plans," accessed May 7, 2020, available at: https://www.directenergyprotects.com/protection-plans/heating.

Direct Energy, "Our Footprint and History," accessed May 7, 2020, available at: https://www.directenergy.com/about/about-direct-energy/history.

Falite Bros., Inc., "Wakefield Residential HVAC Maintenance Plans," accessed May 4, 2020, available at: https://www.falitebros.com/residential-hvac/residential-maintenance-plans/.

FIIIXR, "Annual Air Conditioner Maintenance Cost," accessed May 5, 2020, available at: https://www.fixr.com/costs/annual-air-conditioner-maintenance

Forbes, "7 Powerful Benefits To Mobile Home Park Investing," July 11, 2017, accessed May 4, 2020, available at: https://www.forbes.com/sites/brandonturner/2017/07/11/7-powerful-benefits-to-mobile-home-park-investing/#2175a6286e92.

Freddie Mac Multifamily, "Spotlight on Underserved Markets: Manufactured Housing Resident-Owned Communities," accessed May 5, 2020, available at: https://mf.freddiemac.com/docs/dts_mhroc_report.pdf.

Griffith Energy Services, Inc., "Oil Storage Tanks: Homeowners Have Different Types and Installation Options," December 17, 2014, accessed May 4, 2020, available at: https://www.griffithenergyservices.com/articles/oil-storage-tanks.

Hotel Planner, "Chelmsford Massachusetts Accommodations," accessed May 4, 2020, available at: https://www.hotelplanner.com/Hotels/5692-in-Chelmsford-MA.html#dir-bar

Housecall Pro, "How Much Does An HVAC Technician Make In Every State: Updated For 2020," December 3, 2019, accessed May 4, 2020, available at: https://www.housecallpro.com/learn/hvac-tech-salary/.

IBISWorld, "IBISWorld Industry Report 23822a Heating & Air Conditioning Contractors in the US," December 2019.

IBISWorld, "IBISWorld Industry Report OD5878 Residential RV & Trailer Park Operators in the US," December 2019.

Massachusetts Department of Energy Resources, "Massachusetts Retail Heating Oil Prices," accessed May 4, 2020, available at: https://www.mass.gov/service-details/massachusetts-retail-heating-oil-prices.

Massachusetts Department of Environmental Protection, "Fact Sheet - Tips For Maintaining Your Home Heating System: Prevent Heating Oil Leaks and Spills," at p. 1, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Tips%20for%20Maintaining%20Your%20Heating%20System.pdf.

Massachusetts Department of Environmental Protection, "Homeowner Oil Spill Cleanup Guide," published Fall 2002, updated January 2004, Attachments A & B, accessed May 4, 2020, available at: https://www.mass.gov/files/documents/2017/11/07/Homeowner%20Oil%20Spill%20Cleanup%20Guide.pdf.

Meacham Companies, "One Hour HVAC Maintenance Program," accessed May 5, 2020, available at: https://www.markemeacham.com/hvac/hvac-maintenance-program.html.

MHI (Manufactured Home Institute), "Benefits of Living in a Manufactured Housing Community," accessed May 4, 2020, available at: https://www.manufacturedhousing.org/manufactured-housing-community/.

MHVillage, "Chelmsford Mobile Home Park,"accessed May 4, 2020, available at: https://www.mhvillage.com/parks/14686.

NewHomeSource, "The Guide to Manufactured Homes," April 20, 2020, accessed May 4, 2020, available at: https://www.newhomesource.com/learn/newhomesource-guide-to-manufactured-homes/.

Paynet, "Achieving Greater Predictive Power: Credit Scoring versus Probability of Default," accessed May 8, 2020, available at: https://paynet.com/media/1207/credit-scoring-vs-probability-of-default.pdf.

Paysa, "HVAC Technician Salaries in Chelmsford, MA," last updated May 2, 2018, accessed May 4, 2020, available at: https://www.paysa.com/salaries/hvac-technician--chelmsford,-ma--tl.

Petro Home Services, "How your oil home heating system works," accessed May 4, 2020, available at:https://www.petro.com/resource-center/how-your-oil-fired-heating-system-works.

Powderhorn Agency, "Pennsylvania Manufactured Housing Association," April 1, 2014, accessed May 4, 2020, available at: https://powderhornagency.com/blog/pennsylvania-manufactured-housing-association/.

Preferred Air, "Preferred Maintenance Contracts – Peace of Mind & Savings," accessed May 5, 2020, available at: https://preferredair.com/service-contracts/.

Private Equity Stakeholder Project, "Private Equity Giants Converge on Manufactured Homes," February 14, 2019, accessed May 4, 2020, available at: https://pestakeholder.org/report/private-equity-giants-converge-on-manufactured-homes/.

RHP Properties, "About Us," accessed May 4, 2020, available at: https://www.rhp-properties.com/about.html.

RHP Properties, "Chelmsford Commons Sitemap," accessed May 7, 2020, available at: https://public.rhp-properties.com/newbury/site_maps/sitemap_Chelmsford_Commons.pdf.

RHP Properties, "Corporate Profile," accessed May 4, 2020, available at: http://www.rhpproperties.com/corporate-profile.asp.

Rodenhiser, "Service Plans," accessed May 5, 2020, available at: https://www.rodenhiser.com/maintenance-plans.html.

Shipley Energy, "How Long Should Heating Oil Last, and How Much Will I Use?" accessed May 4, 2020, available at: https://www.shipleyenergy.com/energy-101-guides/guide/2019/10/21/how-long-should-heating-oil-last-and-how-much-will-i-use.

The Washington Post, "A billion-dollar empire made of mobile homes," February 14, 2019, accessed May 4, 2020, available at: https://www.washingtonpost.com/business/economy/a-billion-dollar-empire-made-of-mobile-homes/2019/02/14/ac687342-2b0b-11e9-b2fc-721718903bfc_story.html.

U.S. Bureau of Labor Statistics, "Employer Costs for Employee Compensation Summary," March 19, 2020, accessed May 4, 2020, available at: https://www.bls.gov/news.release/ecec.nr0.htm.

U.S. Bureau of Labor Statistics, "May 2019 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates: Boston-Cambridge-Nashua, MA-NH," accessed May 11, 2020, available at: https://www.bls.gov/oes/current/oes_71650.htm.

Will Van Vactor, "Is Buying a Mobile Home a Good Investment?" Nolo, accessed May 7, 2020, available at: https://www.nolo.com/legal-encyclopedia/is-buying-mobile-home-good-investment.html.

Winters Home Services, "Heating and Cooling 1, 3, & 5 Year Maintenance Program in Boston," accessed May 4, 2020, available at: https://www.wintershomeservices.com/maintenance-plans/heating-cooling-maintenance-program/#~R7T3F52.

**Data**

American Enterprise Institute, "Land Price and Land Share Indicators," accessed May 5, 2020, available at: https://www.aei.org/housing/land-price-indicators/.

U.S. Census Bureau, "AHS 2015 National Public Use File (PUF)," accessed April 22, 2020, available at: https://www.census.gov/programs-surveys/ahs/data/2015/ahs-2015-public-use-file--puf-/ahs-2015-national-public-use-file--puf-.html.